**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| OMNICARE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 08-CV-3901 |
| v. | ) | |
| | ) | Judge Matthew F. Kennelly |
| WALGREENS HEALTH INITIATIVES, | ) | |
| INC., UNITED HEALTHCARE SERVICES, | ) | Magistrate Judge Brown |
| INC., and COMPREHENSIVE HEALTH | ) | |
| MANAGEMENT, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND

### INTRODUCTION

When Plaintiff, Omnicare, Inc. ("Plaintiff"), filed its Amended Complaint, it for the first time alleged a cause of action against Comprehensive Health Management, Inc. ("CHMI") and United Healthcare Services, Inc. ("United") that raises critical issues of federal law regarding the substance and effect of Medicare Part D statutes, regulations, and sub-regulatory guidance. Based upon those new allegations, CHMI timely removed the matter to this Court. In its Motion to Remand (the "Motion"), Plaintiff argues: (i) CHMI is bound by the Pharmacy Network Agreement's ("Agreement") "governing law" clause and that the clause precludes removal; (ii) the Amended Complaint does not raise a substantial federal question; and (iii) CHMI's removal of this action was untimely.

Plaintiff's first argument is unavailing because, by its express terms, the "governing law" clause does not apply to CHMI. Furthermore, that clause does not constitute a clear and unequivocal waiver of the right to removal and is not enforceable. Finally, removal was timely

and appropriate because the Amended Complaint was the first time that a cause of action was based substantially on federal law.

## BACKGROUND FACTS

Plaintiff's Original Complaint, filed on May 29, 2007, only alleged two breach of contract claims against Walgreens Health Initiatives, Inc. ("WHI," and collectively with CHMI and United, the "Defendants"). (*See* Complaint, attached hereto without exhibits as **Exhibit 1**.) On December 6, 2007 and February 29, 2008, respectively, the state court granted United and CHMI leave to intervene; however, the Original Complaint did ***not*** assert any cause of action against them. On May 8, 2008, the Circuit Court of Cook County denied the Defendants' motions to dismiss and granted Plaintiff leave to file an Amended Complaint.

On June 11, 2008, Plaintiff filed its Amended Complaint, which for the ***first*** time asserted a claim against CHMI and United. (*See* Amended Complaint, attached hereto without exhibits as **Exhibit 2**.) Furthermore, Count II of the Amended Complaint for the ***first*** time alleged that all Defendants failed to follow federal Medicare Part D statutes, regulations, and sub-regulatory guidance by not collecting what is known as "best available evidence" of a Medicare recipient's entitlement to a low income subsidy for prescription medicine. As a result, Plaintiff alleges it was not fully reimbursed for drugs it administered to Medicare patients residing in nursing homes. It is undisputed that Plaintiff ***never*** raised these allegations in the Original Complaint.

## ARGUMENT

**I.    THE GOVERNING LAW CLAUSE DOES NOT PREVENT REMOVAL.**

**A.    <u>The Governing Law Clause Does Not Apply to CHMI.</u>**

Although not expressly stated, Plaintiff's argument relies upon the inference that CHMI is somehow bound by Section 7.4 of the Agreement (the "Governing Law Clause"), which states:

> **Governing Law**. *This Agreement will be construed and governed according to the laws of the State of Illinois. The Courts of the State of Illinois shall have exclusive jurisdiction over the parties with respect to any dispute or controversy between them arising under or in connection with this Agreement and, by execution and delivery of this Agreement, each of the parties to this Agreement <u>submits to the jurisdiction of those courts, including the in personam and subject matter jurisdiction of those courts</u>,* waives any objection to such jurisdiction on the grounds of venue or forum non conveniens, the absence of in personam or subject matter jurisdiction and any similar grounds, consents to service of process by mail or any other manner permitted by law, and irrevocably agrees to be bound by any judgment rendered there by in connection with this Agreement. *These <u>consents to jurisdiction</u> shall not be deemed to confer rights on any person other than the parties to this Agreement.*

(Agreement at § 7.4) (emphasis added).

Plaintiff, however, cites absolutely no facts to support the proposition that CHMI is bound by that clause. Moreover, the Governing Law Clause specifically limits its applicability to the "parties" to the Agreement: "[t]hese consents to jurisdiction shall not be deemed to confer rights on any other person other than the ***parties*** to this Agreement." (*See* Agreement at § 7.4) (emphasis added). The "parties" to the Agreement are identified in the preamble, which states that "THIS PHARMACY NETWORK AGREEMENT . . . is made this 29[th] day of July, 2005 . . . by and between Omnicare, Inc. . . . and Walgreens Health Initiatives, Inc." (*See* Agreement at p. 1.) In other sections within the Agreement, the words "party" or "parties" are used to refer to Plaintiff and WHI. (*See, e.g.,* Agreement § 3.7) ("[d]uring the term of this Agreement and for a period of 180 days thereafter, neither party shall engage in any national or regional effort to solicit, employ or contract with employees of the other party (including Omnicare Pharmacies).").

If the parties to the Agreement had wanted the Governing Law Clause to apply to ***non-parties*** such as CHMI, they would have expressly identified the Medicare Part D Plans in this

clause as they did in separate provisions within the Agreement.  (*See, e.g., id.* at § 3.6) ("[n]either PBM nor any Plan will take any action to prevent or affect Omnicare's ability to negotiate, obtain and retain rebates and discounts from pharmaceutical manufacturers.").

Moreover, enforcing the Governing Law Clause against CHMI under the circumstances of this case would be unreasonable.  *See* <u>M/S Bremen v. Zapata Off-Shore Co.</u>, 407 U.S. 1, 10 (1972) (explaining that forum selection clauses will not be enforced when "enforcement is shown by the resisting party to be 'unreasonable' under the circumstances.").  Particularly, enforcing the Governing Law Clause against CHMI would deny CHMI its statutory right to have this matter (which raises substantial federal issues relating to Medicare Part D) heard by this Court, notwithstanding the fact that the Governing Law Clause does not apply to non-parties such as CHMI, CHMI did not sign the Agreement, and CHMI is not a resident of the State of Illinois.  Forcing CHMI to be bound by a clause to which it did not agree and, in doing so, denying CHMI its statutory right to removal, would be wholly unreasonable.

Thus, Plaintiff's argument that CHMI is somehow bound by the Governing Law Clause is not only unsubstantiated, it also directly contradicts the express language of the Governing Law Clause.  In addition, under the circumstances of this case, it would be unreasonable for this Court to enforce the clause against CHMI.[1]

---

[1]    Furthermore, even assuming that the Governing Law Clause applies to WHI, this Court has the discretion to refrain from remanding the claims against WHI.  *See* <u>United Mine Workers of America v. Gibbs</u>, 383 U.S. 715, 725 (1966) (explaining that when "state and federal claims . . . derive from a common nucleus of operative fact [and] if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is power in federal courts to hear the whole.").  In this case, remanding the claims with respect to WHI would result in inefficiencies and inconvenience to all the parties because it would, among other things, result in duplicative actions that may give rise to conflicting opinions.

**B.      The Governing Law Clause Does Not Constitute a Clear and Unequivocal Waiver of Any Party's Right to Removal.**

Independent of the foregoing, the Governing Law Clause does not preclude removal because it does not clearly and unequivocally waive that right.  It is beyond question that a defendant has a statutory right to removal.  Oshana v. Coca-Cola Co., 472 F.3d 506, 510 (7th Cir. 2006) ("[a] defendant has the right to remove a case from state to federal court when the federal court could exercise jurisdiction in the first instance.")  Moreover, although a party may contractually waive the right to removal through a forum selection clause, the clause must *clearly and unequivocally* evidence waiver of that right.  *See, e.g.,* Newly Weds Foods, Inc. v. A.M. Todd Group, Inc., No. 03-C-7827, 2004 WL 755703, at *1 (N.D. Ill. Feb. 18, 2004) (explaining that in "some cases, such a clause may constitute waiver of a defendant's right to remove a suit to federal court . . . [but] [a]ny waiver must be clear and unequivocal.")[2]; *see also* EBI-Detroit, Inc. v. City of Detroit, No. 07-1391, 2008 WL 2130472, at *5 (6th Cir. May 22, 2008) (holding that forum selection clause did not evidence "clear and unequivocal" waiver where "it says nothing about the defendants' right to remove.").

As an initial matter, the Governing Law Clause does *not* clearly and unequivocally establish the waiver of the right to removal.  Had the drafting parties intended to waive right to proceed in federal courts, they could have simply so stated.  *See, e.g.,* L&L Painting Co. v. Odyssey Contracting Corp., No. 08 Civ. 3559, 2008 WL 2856475, at *1 (S.D.N.Y. July 22, 2008) (finding a clear and unequivocal waiver of the right to removal where the contract expressly stated that the defendant "expressly waives and relinquishes any rights it might otherwise have . . . to *remove to Federal Court* . . .").

---

[2]      Copies of all unreported cases are attached hereto, in order of citation, as **Exhibit 3**.

Furthermore, it is well-settled that ambiguities in contract provision are construed against the drafter—which in this case is ***not*** CHMI. *See, e.g.,* <u>Truserve Corp. v. Prices Ilfeld Hardware Co., Inc.</u>, No. 01-C-50271, 2001 WL 1298718 (N.D. Ill. Oct. 24, 2001) (after construing ambiguous forum selection clause against the drafter, holding that the clause included both state and federal courts). Here, at best, the clause is ambiguous and, as such, should be construed in favor of CHMI.

First, although Plaintiff refers to it as a "forum selection clause," it is labeled a "governing law" clause. The clause then goes on to simply prescribe the substantive law that governs the interpretation of the Agreement and the jurisdiction to which the parties submit. (*See* Agreement at § 7.4) (stating that "each of the parties to this Agreement ***submits to the jurisdiction*** of those courts" and "[t]hese ***consents to jurisdiction*** shall not be deemed to confer rights on any person other than the parties to this Agreement."). Nothing within this provision establishes a specific forum or venue for the claims and, as such, is not a "forum selection clause."

Second, even assuming that it could be interpreted as a forum selection clause, the term "the Courts of the State of Illinois" can reasonably be interpreted to mean either state or federal courts of the State of Illinois. *See* <u>Regis Assoc. v. Rank Hotels (Management) Limited</u>, 894 F.2d 193, 194–95 (6th Cir. 1990) (finding that forum selection clause, which stated the "parties hereby submit to the jurisdiction of the Michigan Courts," could include both state and federal courts of the State of Michigan). Accordingly, because the clause is, at best, ambiguous, it does not clearly and unequivocally waive any party's right to removal.

C.     **Assuming that the Governing Law Clause is a Forum Selection Clause, It Is Not Enforceable Because It Does Not Establish Exclusive Venue.**

Independent of the foregoing, assuming *arguendo* that the Governing Law Clause is a forum selection clause, remand is inappropriate because the clause does not establish an exclusive venue.  The Seventh Circuit has made it clear that a forum selection clause will not be enforced where the clause only speaks to *jurisdiction* and does not establish an exclusive *venue*:

> We have said that where ***venue*** is specified with mandatory or obligatory language, the clause will be enforced; ***where only jurisdiction is specified, the clause will generally not be enforced unless there is some further language indicating the parties' intent to make venue exclusive***.

Muzumdar v. Wellness Int'l Network, 438 F.3d 759, 762 (7th Cir. 2006) (emphasis added) (finding forum selection clause to establish exclusive venue in Dallas County, Texas where the clause specifically stated "jurisdiction and *venue* . . . shall be proper only in" that county) (emphasis added); *see also* Hull 753 Corp. v. Elbe Flugzeugwerke GmbH, 58 F. Supp. 2d 925, 927 (N.D. Ill. 1999) ("[i]t has long been established that personal jurisdiction and venue are discrete concepts that should be kept separate.  Thus, when parties to a contract locate jurisdiction in a certain court, it does not necessarily follow that they have agreed to venue only in that court."); City of New Orleans v. Municipal Administrative Services, Inc., 376 F.3d 501, 504 (5th Cir. 2004) (holding that forum selection clause did not establish exclusive venue and that the defendant did not waive its right to removal where the clause stated the "[t]he undersigned Contractor does further hereby consent and yield to the jurisdiction of the State Civil Courts of the Parish of Orleans and does hereby formally waive any pleas of jurisdiction on account of the residence elsewhere of the undersigned Contractor.").

In this case, assuming that Section 7.4 is a "forum selection clause" that applies to all Defendants, it is nevertheless unenforceable because it does not establish an exclusive ***venue*** in

7

any court; instead, the clause simply speaks to personal jurisdiction over the parties.   In particular, the clause states that "[t]he Courts of the State of Illinois shall have exclusive *jurisdiction over the parties*."  (Agreement §7.4.)  Thus, this phrase speaks only to personal jurisdiction, a conclusion that is emphasized by latter provisions within the clause—*i.e.,* "by execution and delivery of this Agreement, each of the parties to this Agreement *submits to the jurisdiction* of those courts," and "[t]hese *consents to jurisdiction* shall not be deemed to confer rights on any person other than the parties to this Agreement."   (Id.)   As is evident, the Governing Law Clause only speaks to jurisdiction and not venue.   Accordingly, the clause is unenforceable and cannot constitute a basis for remand.

**II.    COUNT II OF THE AMENDED COMPLAINT RAISES A SUBSTANTIAL FEDERAL QUESTION AND, THEREFORE, REMOVAL WAS APPROPRIATE UNDER 28 U.S.C. § 1331.**

**A.    Federal Jurisdiction Lies Over Claims That Present a Substantial Federal Question.**

The U.S. Supreme Court has long recognized that "in certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues."  Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 312 (2005); *see also* Teamsters Nat. Auto. Transporters Indus. Negotiating Comm. v. Troha, 328 F.3d 325, 328 (7th Cir. 2003) (federal jurisdiction "includes most causes of action, state or federal, where the plaintiff's right to relief necessarily depends on the resolution of a substantial federal question.").  This variety of federal jurisdiction has been referred to as the "substantial federal question" doctrine, or the "arising under" type of federal jurisdiction.  Id.  As the Court explained, this "arising under" jurisdiction "captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on *substantial questions of federal law*,

and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." Id. (emphasis added).

In Grable, the U.S. Supreme Court determined that federal jurisdiction was proper in a dispute over title to land purchased at a federal tax sale, where the plaintiff only asserted state law claims but those claims necessarily depended on the interpretation of the notice statute in federal tax law. In holding that federal jurisdiction existed, the Court declined to create a hard test for determining the propriety of "substantial federal question" jurisdiction; instead, the Court conducted a two prong assessment:

> [T]he question is, [1] does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, [2] which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities.

Id., at 314. In applying that test, the Court explained that the plaintiff had "premised its superior title claim on a failure by the IRS to give it adequate notice," which was governed by federal law, and that this federal issue was actually disputed and substantial because it was an "essential element" of the claim. Id. Therefore, the Court concluded that "the meaning of the federal tax provision is an important issue of federal law that sensibly belongs in a federal court." Id. at 314–15.

**B.    The Allegations in Count II of the Amended Complaint Depend Entirely Upon this Court's Interpretation of the Substance and Effect of Medicare Part D Statutes, Regulations and Sub-Regulatory Guidance.**

Although Plaintiff attempts to present the allegations in Count II of the Amended Complaint as a simple state-law breach of contract claim, nothing could be further from reality. Even a cursory glance at Count II demonstrates that this is a state-law claim only in name, as Plaintiff does not even mention the contract until after two lengthy paragraphs discussing Medicare Part D and the Centers for Medicare and Medicaid Services' ("CMS") sub-regulatory

guidance relating to the collection of "best available evidence." (*See* Ex. 2, Amended Complaint, at ¶¶ 20–21.) Even when Plaintiff does mention the contract, it is only as a vehicle by which to assert the claim that Defendants violated federal law, stating "WHI, and United and Comprehensive, through WHI, their agent, have obligations under the Omnicare contract ***to abide by CMS guidance***." (Id. at ¶ 22) (emphasis added). Plaintiff continues, alleging that Defendants have breached their contract by "refusing to collect, update and/or maintain their member data, ***as required by CMS***, in order to provide for the correct adjudication of claims for institutionalized full subsidy eligible beneficiaries." (Id. at ¶ 23) (emphasis added). These two paragraphs, neither of which alleged the breach of any specific provision of the contract, are the extent of Plaintiff's discussion of Defendants' alleged obligations under the contract in Count II.

Notably, Plaintiff does not even mention the contract when discussing its damages, stating simply that "[a]s a result of [Defendants'] ***failures to follow CMS guidance*** in regard to maintaining accurate member data . . . [Defendants] owe Omnicare [damages]." (Id. at ¶ 25) (emphasis added). Therefore, it is clear from a plain reading of Count II that this Court's analysis of Medicare Part D statutes, regulations, and sub-regulatory guidance is essential to Plaintiff's claim (indeed, it is the *only* element of Plaintiff's claim), and that this issue is clearly disputed between the parties. Further, as Plaintiff's allegation in Count II is purely federal and only nominally a state-law claim, this Court may hear it without disturbing the balance of state and federal judicial responsibilities. As such, this Court has jurisdiction to hear this matter.

### C.    Plaintiff's Cases Are Inapposite.

Plaintiff cites to a variety of cases to argue that the Amended Complaint does not present a substantial issue of federal law. Each of those cases, however, studiously ignores Plaintiff's

allegations and the fact that ***none*** of those cases required a court to interpret significant issues of federal law.

At the outset, Plaintiff, citing to a sentence fragment in <u>McCall-Bey v. Franzen</u>, 777 F.2d 1178, 1186 (7th Cir. 1985), disingenuously attempts to draw a bright line rule that contractual disputes are exclusively the jurisdiction of state courts.  As the full sentence demonstrates, however, no such bright line exists: "[a] dispute between residents of the same state over the meaning of their contract is not of that kind [which requires federal jurisdiction].  Such disputes are traditionally, uncontroversially, and exclusively within the jurisdiction of state courts."  <u>Id.</u> As this case does not involve a dispute between parties in the same state (indeed, the parties are all diverse and only WHI is a resident of Illinois) about the meaning of the contract, <u>McCall-Bey</u> is inapplicable.  Rather, the instant case requires this Court to resolve critical issues of federal law relating to Medicare Part D.  In such instances—notwithstanding the fact that Plaintiff may marginally alleged a breach of contract claim—federal jurisdiction exists.  *See, e.g.,* <u>Guardian Nat. Acceptance Corp. v. Swartzlander Motors, Inc.</u>, 962 F. Supp. 1137, 1143 (N.D. Ind. 1997) (holding that a breach of contract action that required interpretation of Truth in Lending Act raised substantial federal question).

Plaintiff further relies heavily upon <u>Kurz v. Fidelity Mgmt. & Research Co.</u>, No. 07-CV-709, 2007 WL 3231423 (S.D. Ill. Oct. 30, 2007), indicating that the case was "particularly instructive" while failing to provide any of the facts necessary to understand the court's ruling. Specifically, <u>Kurz</u> involved state law claims for breach of contract arising out of the defendant's alleged violation of the duty of best execution contained in its brokerage agreement with plaintiff.  In holding that federal jurisdiction did not exist, the <u>Kurz</u> court explained that federal law was, if anything, only ancillary to the state law claim.  (<u>Id.</u> at *10).  Furthermore, the court

stated that the "duty of best execution, although extensively codified in federal law governing securities, originates in familiar common-law principles of agency." Id. at *8-9. This essential fact immediately clarifies the difference between Kurz and the case at bar—Plaintiff's allegations in the Amended Complaint arise under Medicare Part D, which is a purely federal statutory creation and not, as in Kurz, rooted in the common-law. More importantly, in this case, federal law is not a mere element of the claim; rather, it is the entire claim because resolution of this matter will depend entirely upon this Court's interpretation of the application, substance, and effect of Medicare Part D statutes, regulations, and sub-regulatory guidance. As such, the holding in Kurz is neither "instructive" nor supports remand of this matter.

For the same reasons, Plaintiff's citation (without discussion) to Empire Healthchoice Assurance, Inc. v. McVeigh, 547 U.S. 677 (2006), and reliance on Bennett v. Southwest Airlines Co., 484 F.3d 907 (7th Cir. 2007) and Fuller v. BNSF Railway Co., 472 F. Supp. 2d 1088 (S.D. Ill. 2007), is misplaced. In each of those cases, the plaintiff asserted a state claim that only tangentially raised an issue of federal law and did not require any court to interpret a federal statute or regulation. See Empire Healthchoice Assurance, Inc., 547 U.S. at 687–88 (a health insurer alleged that one of its members breached the reimbursement provision of the contract, where the only reference to federal law was the fact that the contract was contemplated by federal law); Bennett, 484 F.3d at 908 (alleging, as an element of a negligence *per se* claim, that defendants failed to follow federal aviation guidelines); Fuller, 472 F. Supp. 2d at 1094 (alleging, as an element of a negligence claim, that the defendant failed to follow a federal regulations relating to train crossings). In this case, unlike each of those cases, Plaintiff's claim rests entirely upon this Court's interpretation as to the application, substance, and effect of Medicare Part D statutes, regulations, and sub-regulatory guidance. Accordingly, those cases are inapposite.

Finally, <u>Wisconsin v. Abbott Laboratories</u>, 390 F. Supp. 2d 815 (W.D. Wis. 2005) actually supports CHMI's position that the allegations in Count II present a substantial federal question because, in addressing state law claims that required the court to interpret a single provision in the Medicare statute, the court held that the claims "present[ed] a substantial and disputed question of federal law." <u>Id.</u> at 823. The court in <u>Abbott Labs</u> ultimately found that remand was proper for other reasons. First, the Plaintiff in that case was the State of Wisconsin, rather than a private corporation as here, which clearly affected the balance between state and federal interests, but which is not a consideration in this matter. Second, in <u>Abbott Labs</u>, the State of Wisconsin brought five counts against the several defendants, four of which were alleged violations of Wisconsin statutes. <u>Id.</u> at 818. In this case, however, Plaintiff has not alleged a single violation of any provision of Illinois statutory law. Lastly, the federal question implicated in <u>Abbott Labs</u> was the meaning of a *single term* within the federal Medicare program (which, according to the court was sufficient to implicate a substantial federal question), a far cry from Plaintiff's allegations here, which turn *entirely* on the resolution of critical issues of federal law relating to the rights and liabilities of the federal government, Medicare Part D Plans, pharmacy benefit managers, and pharmacies with respect to Medicare Part D. As such, <u>Abbott Labs</u> does not defeat federal jurisdiction in this matter, but actually clarifies that Plaintiff's allegations raise a substantial federal question and that removal here will not disrupt the state-federal balance.

## III.   DEFENDANTS HAVE TIMELY FILED THEIR NOTICE OF REMOVAL AS THE AMENDED COMPLAINT, FOR THE FIRST TIME, IMPLICATES FEDERAL JURISDICTION.

Under 28 U.S.C. § 1446(b), when the case is not removable based upon the initial pleading, notice of removal "shall be filed within thirty days after the receipt by the defendant . . . of a copy of an amended pleading . . . from which it may first be ascertained that

the case is one which is or has become removable." 28 U.S.C. § 1446(b). Defendants have complied fully with 28 U.S.C. § 1446(b) because the first pleading which raised a federal question is the Amended Complaint.

Plaintiff attempts to muddy this issue by omitting any reference to Count II of the Amended Complaint, which is *entirely* new. In Count II, Plaintiffs *for the first time* bring a claim against CHMI and United. (*Compare* Ex. 1, Complaint *with* Ex.2, Amended Complaint.) Not only is Count II new to the Amended Complaint, but, as discussed thoroughly above, it is only nominally a state-law claim and is substantially a federal claim that Defendants failed to comply with Medicare Part D statutes, regulations, and CMS sub-regulatory guidance.

Notably, in its Motion, Plaintiff does not cite to the actual allegations made against WHI in the Original Complaint, but rather cites to a variety of paragraphs discussing the background to the Complaint (which clearly involved Medicare Part D and CMS Guidance). Presumably this is because the actual allegations demonstrate that the substantial federal issue arises for the first time in the Amended Complaint. In the Original Complaint, Plaintiff alleges only two counts, both of which are exclusively against WHI: (1) breach of contract for failure to pay withheld cost-sharing amounts (Ex. 1, Complaint, ¶ 14); and (2) breach of contract for failure to pay rejected claims. (Id. at ¶ 40.) Both of these allegations remain in the Amended Complaint, but Plaintiff also adds a new count against all Defendants, alleging they failed to follow CMS guidance. (Ex. 2, Amended Complaint, ¶ 25.) Therefore, a simple comparison of the Complaints demonstrates that the substantial federal question presented in Count II of the Amended Complaint is entirely new and removal was timely.

## CONCLUSION

Plaintiff's argument that the Governing Law Clause precludes removal is nothing more than a red-herring because that clause does not apply to CHMI (the removing party); does not clearly and unequivocally waive the right to removal; and is unenforceable. It appears that Plaintiff's Motion is an attempt to detract attention from the real issue—*i.e.,* that for the first time in this lawsuit, the Amended Complaint raises a substantial federal question because it requires this Court to interpret the substance and effect of extensive federal statutes, regulations, and sub-regulatory guidance relating to Medicare Part D. Within thirty days after receiving the Amended Complaint, CHMI (with the consent of WHI and United) removed the matter to this Court. Accordingly, removal was both appropriate and timely and, as such, CHMI respectfully requests that this Court deny Plaintiff's Motion.

Dated: August 21, 2008

Respectfully submitted,

COMPREHENSIVE HEALTH
MANAGEMENT, INC.


_____/s/ Edwin E. Brooks_____
One of Its Attorneys

Edwin E. Brooks
Steven D. Hamilton
Erin K. McAllister
MCGUIREWOODS LLP
77 West Wacker Drive, Suite 4100
Chicago, Illinois 60601
Tel.    312-849-8100
Fax    312-849-3690

*Attorneys for Comprehensive Health
Management, Inc.*

## CERTIFICATE OF SERVICE

I, Steven D. Hamilton, an attorney, hereby certify that on August 21, 2008, I caused a copy of the foregoing *Defendants' Joint Response in Opposition to Plaintiff's to Motion to Remand* to be filed with the Court's electronic filing system. Parties may access this document through that system. Additionally, I hereby certify that I caused copy of the same to be served First Class U.S. Mail, postage prepaid, at 77 West Wacker Drive, Suite 4100, Chicago, IL 60601, upon the following people:

Harvey Kurzweil
Brian S. McGrath
Dewey & Leboeuf LLP
1301 Avenue of the Americas
New York, NY 10019-6092

/s/ Steven D. Hamilton

\6486352.6

# EXHIBIT 1

## CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| OMNICARE, INC., | ) | 2007L005503 |
| | ) | CALENDAR/ROOM N |
| Plaintiff, | ) | TIME 00:00 |
| | ) | Breach of Contract |
| v. | ) | **No.** |
| | ) | |
| WALGREENS HEALTH INITIATIVES, INC., | ) | **JURY DEMAND** |
| | ) | |
| Defendant. | ) | |

### COMPLAINT AT LAW

Plaintiff, Omnicare, Inc., by and through its attorneys, Jenner & Block LLP, for its complaint against Defendant, Walgreens Health Initiatives, Inc., states as follows:

### COUNT I

### (Breach of Contract To Pay Withheld Cost-Sharing Amounts)

1.    Plaintiff Omnicare, Inc., ("Omnicare") is a corporation organized and existing under the laws of the State of Delaware, maintaining, at all relevant times, a principal place of business in Covington, Kentucky. Omnicare provides pharmaceutical products and services to residents of Long Term Care ("LTC") facilities and is reimbursed for its products and services by healthcare insurance companies.

2.    Defendant Walgreens Health Initiatives, Inc. ("WHI") is a corporation organized and existing under the laws of the State of Illinois, maintaining, at all relevant times, a principal place of business in Deerfield, Lake County, Illinois. WHI is engaged in business as a healthcare insurance company. WHI does business in Cook County, Illinois.

3.    The Medicare Prescription Drug Improvement and Modernization Act of 2003 created a new Medicare prescription drug benefit (commonly known as "Part D"), which is administered by the Centers for Medicare and Medicaid Services ("CMS"). Under Part D, private at-risk prescription drug plans ("Part D Plans") function as payors for the prescription drug benefits of patients enrolled in the given Part D Plan. WHI is a pharmacy benefit manager ("PBM") which processes and pays pharmacy claims on behalf of several Part D Plans.

4.    To be approved by CMS, a Part D Plan must meet certain minimum requirements, such as showing it has an adequate network of pharmacies. Part D Plans, or PBMs acting on their behalf, thus routinely contract with Omnicare to serve as an institutional pharmacy for their members. Pursuant to these contracts, Omnicare is reimbursed by the PBM or Part D Plan for the pharmacy services they provide to these members.

5.    Many enrollees in Part D Plans are "institutionalized full subsidy eligible individuals" under the CMS regulations for Part D. Primarily nursing home residents, these individuals are enrolled in both a state Medicaid program and a Medicare Part D Plan. Their dual enrollment in Medicare and Medicaid exempts them from the "cost-sharing" amounts that would otherwise be payable by beneficiaries under a Part D Plan, such as deductibles, co-payments or coinsurance amounts. Instead, CMS provides cost-sharing subsidies to Part D Plans to cover these amounts.

6.    By law, if a Part D Plan (including any PBM acting on its behalf) specifies that institutionalized full subsidy eligible individuals must pay cost-sharing when it processes their pharmacy claims, it must pay these individuals any cost-sharing that it withheld. (See 42 C.F.R. 423.800(c).) Many LTC pharmacies have not collected cost-sharing amounts from institutionalized full subsidy eligible individuals who are residents of nursing homes and other

LTC facilities. Consequently, these LTC pharmacies are left holding receivables for the services they rendered to those individuals. Recognizing the difficulty of collecting cost-sharing from patients in nursing homes and LTC facilities, CMS has directed Part D Plans to pay the specified cost-sharing amounts they withheld directly to LTC pharmacies that have not collected cost-sharing amounts from such beneficiaries and are holding receivables for those amounts.

7.      On July 29, 2005, Omnicare and WHI entered into a written contract denominated Pharmacy Network Agreement ("Agreement") by which Omnicare agreed to provide pharmaceutical products and services to Part D Plan members. In return, WHI agreed to pay Omnicare for prescription claims approved by WHI at the prices specified on Schedule 3.1(a) to the Agreement, and to perform its obligations under the Agreement in conformance with the Part D Rules, including "CMS instructions, and CMS published sub-regulatory guidance relating to the Part D prescription drug benefit...." (See Section 3.1(a), Section 5.1, Section 5.3, and the definition of "Part D Rules" in Article 1.) A copy of the Agreement is attached as Exhibit 1.

8.      During the period of January 1, 2006, through April 28, 2007, Omnicare provided prescription drugs to institutionalized full subsidy eligible beneficiaries of the Part D Plans covered by the Agreement for which WHI approved the prescription claim but withheld a cost-sharing amount. Omnicare did not collect these cost-sharing amounts from the beneficiaries or any other source, and currently holds a receivable for these amounts. In accordance with the terms of the Agreement and the applicable Part D Rules, WHI is obligated to pay these withheld cost-sharing amounts to Omnicare, but, despite demand, has failed to make such payments in full.

9.      WHI breached the Agreement by failing and refusing to pay Omnicare the withheld cost-sharing amounts.

10.     WHI's breaches are ongoing.

11.     As a result of WHI's failure to pay these cost-sharing amounts to Omnicare, for the period January 1, 2006, through April 28, 2007, WHI owes Omnicare an amount in excess of $7,786,178.

12.     Omnicare has performed all of the terms of the Agreement to be performed by it and all conditions precedent to WHI's obligation to pay Omnicare the withheld cost-sharing amounts.

13.     WHI's breach of the Agreement has caused Omnicare injury and damages in an amount in excess of $7,786,178.

## COUNT II

### (Breach of Contract To Reimburse)

14.     Omnicare realleges and incorporates in this Count II each of the allegations contained in paragraphs 1 through 4 and paragraph 7 of Count I.

15.     Part D places certain restrictions on choice and administration of prescription drugs. These restrictions were designed foremost to apply in the retail drug context (i.e. where an individual fills his or her own prescription at a retail pharmacy). However, a portion of Part D beneficiaries are confined to nursing homes or other types of LTC facilities. Residents of LTC facilities do not fill their prescriptions at retail pharmacies. Instead, their prescriptions are ordered on their behalf by the facilities in which they reside and filled by an institutional pharmacy such as Omnicare.

16.     Part D beneficiaries residing in LTC facilities thus present special challenges to Part D Plans and institutional pharmacies in their administration of Part D. For example, the Part D program places limitations on the frequency with which an enrollee's prescriptions can be refilled. However, when individuals are first admitted to a nursing home, they are generally not

permitted to bring any of their prescription drugs with them from home. Because individuals can be admitted to a nursing home at any point in their prescription cycle, the pharmacies servicing nursing homes may need to fill a newly admitted patient's prescriptions immediately, regardless of whether three days or twenty-five days have passed since the patient's prescription was last filled. The alternative would be for a patient to go unmedicated for days or even weeks. Another example is when, for a transitional period, LTC pharmacies are given an order for a drug not covered by the formulary set by a specific Part-D plan. In some instances this occurs because upon admission to a LTC facility, individuals may enroll in a new Part D Plan that has drug formularies that are different from the individuals' previous plans. In other instances, individuals enrolled in a Part D Plan may have been prescribed non-formulary drugs during a hospital stay, but upon discharge from a hospital and re-admission to the LTC facility must revert to their Part D Plan's formularies. Patients in these situations are often on a number of different medications. LTC pharmacies thus may be asked to dispense non-covered drugs while new formularies are phased in over a period of months in order to protect patients from the physical shock of switching several drugs at once.

17.    Prior to the implementation of Part D, CMS emphasized the "unique needs of residents of long term care facilities who enroll in a new Part D Plan." Because such residents are "likely to be receiving multiple medications for which simultaneous changes could significantly impact the condition of the enrollee," CMS encouraged Part D Plans to shape appropriate policies for transitional prescription drug coverage, calling transition periods of 90 to 180 days "appropriate." (See Information for Part D Sponsors on Requirements for a Transition Process dated March 16, 2005, attached hereto as Exhibit 2.)

18.    After Part D's inception, CMS has continued to recognize that LTC pharmacies frequently face situations where what is best for their patients does not necessarily follow standard Part D protocols.  Rather than putting LTC pharmacies in the position of choosing between harming patients and not getting paid, CMS has given its approval to Part D Plans reimbursing LTC pharmacies for drugs they dispense in these unique circumstances despite their variance from the Part-D protocols established for retail pharmacies.

19.    In its Question & Answer Clarification dated May 23, 2006, CMS sanctioned differential treatment between "ambulatory" patients and those confined to LTC facilities when "it is appropriate or legally required under our Part D guidance...For example, it is perfectly acceptable for plans to adopt <u>alternative standards applicable only in the LTC setting</u> when clinically justified, legally required, or otherwise justified based on characteristics unique to beneficiaries residing in LTC facilities...." (See CMS Q&A of May 23, 2006, attached hereto as Exhibit 3, emphasis added.)

20.    More specifically, CMS has limited the use of early refill edits (rejections of claims based on refilling too early in the prescription cycle).  These edits "cannot be used to limit appropriate and necessary access" to Part D benefits.  (See CMS Q&A of April 10, 2006, attached hereto as Exhibit 4.)  CMS provides an example of an inappropriate "too soon" edit: Part D Plans must not deny claims for refills to patients upon admission to or discharge from LTC facilities.  (Id.)

21.    Each Part D Plan has its own computerized processing system or provides a protocol to its PBM for claims processing.  The Part D Plans program these systems to process claims in a way that is consistent with the breadth of Part D coverage.  Whenever there are

changes to Part D coverage or updates from CMS regarding the treatment of certain claims, Part D Plans must update their processing systems accordingly.

22.     Under the parties' Agreement, Omnicare agreed to provide pharmaceutical products and services to enrollees of the Part D Plans listed on Exhibit A to the Agreement.

23.     In return, WHI agreed to pay Omnicare for prescription claims approved by WHI at the prices specified on Schedule 3.1(a) to the Agreement, and to perform its obligations under the Agreement in conformance with the Part D Rules, including "CMS instructions, and CMS published sub-regulatory guidance relating to the Part D prescription drug benefit...." (See Section 3.1(a), Section 5.1, Section 5.3, and the definition of "Part D Rules" in Article 1.)

24.     Additionally, WHI acknowledged that "certain of the restrictions under the Plans may not be appropriate in the context of Plan Enrollees who are residents of [LTC] Facilities." (See Agreement Section 3.8.)  Accordingly, WHI guaranteed coverage of certain drugs that might otherwise be denied by Part D Plans.  The special circumstances that might require WHI to pay for Omnicare's provision of non-covered drugs, or covered drugs under non-covered circumstances, are described in detail in, *inter alia*, the Agreement's Sections 3.8(c), 3.8(h), and 3.8(i).

25.     In order for WHI to properly adjudicate drugs dispensed under these special circumstances, it agreed to use "commercially reasonable efforts to adjudicate Claims submitted by Omnicare Pharmacies using its On-Line System" in a way consistent with its guarantee of expanded coverage under Section 3.8. (Id.)  Should a claim covered by Section 3.8 be rejected by WHI's On-Line System, meaning the On-Line System improperly rejected the claim as non-payable, WHI must pay the claim within thirty days of Omnicare's written notice of the improper adjudication. (Id.)

26.    During the period of January 1, 2006, through May 13, 2007, Omnicare provided prescription drugs under the special conditions described in Section 3.8 to many of WHI's members. When Omnicare submitted claims for these prescriptions, WHI's On-Line System improperly adjudicated these claims as non-covered and did not reimburse Omnicare for them (collectively, the "Rejected Claims"). Under the terms of the parties' Agreement, WHI is obligated to pay these claims.

27.    Consistent with Section 3.8 of the Agreement and CMS guidance, Omnicare brought these claims rejected by the On-Line System to WHI's attention and requested payment. WHI did not pay these claims within thirty days, as contractually required, and continues to withhold payment to Omnicare.

28.    On February 14, 2007, Omnicare notified WHI in writing of its demand that WHI reimburse Omnicare in full for Rejected Claims. To date, WHI has failed and refused to pay Omnicare the amounts owed with respect to these claims.

29.    WHI's failure to pay Omnicare for Rejected Claims constitutes a breach of the Agreement.

30.    WHI's breaches are ongoing.

31.    As a result of WHI's failure to pay amounts due Omnicare for Rejected Claims, for the period January 1, 2006, through May 13, 2007, WHI owes Omnicare an amount in excess of $1,088,863.

32.    Omnicare has performed all of the terms of the Agreement to be performed by it and all conditions precedent to WHI's obligation to pay Omnicare.

33.    WHI's breach of the Agreement has caused Omnicare injury and damages in an amount in excess of $1,088,863.

WHEREFORE, Plaintiff, Omnicare, Inc., demands trial by jury, and further demands judgment against Defendant, Walgreens Health Initiatives, Inc., as follows:

1.    On Count I, the amount of $7,786,178 with interest, costs, and expenses.

2.    On Count II, the amount of $ 1,088,863 with interest, costs, and expenses.

3.    Such other and further relief as to the Court deems just.

Date:  May 29, 2007

Omnicare, Inc.

By:    _____
       One of the Attorneys for Omnicare, Inc.

Richard P. Campbell
Jenner & Block LLP
330 North Wabash Avenue
Chicago, Illinois  60611-7603
Telephone:   312 222-9350
Facsimile:   312 527-0484
Firm I.D. No. 05003

# EXHIBIT 2

05003

0P

FILED-2
2009 JUN 11 AM 11:52
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT

**CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

OMNICARE, INC.,                    )
                                   )
            Plaintiff,             )
                                   )
v.                                 )      No. 07 L 005503
                                   )
WALGREENS HEALTH INITIATIVES, INC.,)      Judge Dennis J. Burke
UNITED HEALTHCARE SERVICES, INC.,  )
and COMPREHENSIVE HEALTH           )      Calendar N
MANAGEMENT, INC.                   )      3011
                                   )      2871
            Defendant.             )      3004

## AMENDED COMPLAINT

Plaintiff, Omnicare, Inc., by and through its attorneys, Jenner & Block LLP, for its complaint against Defendants, Walgreens Health Initiatives, Inc., United Healthcare Services, Inc., and Comprehensive Health Management, Inc., states as follows:

### COUNT I

**(Breach of Contract To Pay Withheld Cost-Sharing Amounts Against WHI)**

1.      Plaintiff Omnicare, Inc., ("Omnicare") is a corporation organized and existing under the laws of the State of Delaware, maintaining, at all relevant times, a principal place of business in Covington, Kentucky. Omnicare provides pharmaceutical products and services to residents of Long Term Care ("LTC") facilities and is reimbursed for its products and services by healthcare insurance companies.

2.      Defendant Walgreens Health Initiatives, Inc. ("WHI") is a corporation organized and existing under the laws of the State of Illinois, maintaining, at all relevant times, a principal place of business in Deerfield, Lake County, Illinois. WHI is engaged in business as a healthcare insurance company. WHI does business in Cook County, Illinois.



3.      Defendant United Healthcare Services, Inc. ("United") is a corporation organized and existing under the laws of Minnesota, maintaining, at all relevant times, a principal place of business in Minnetonka, Minnesota.  United is engaged in business as a healthcare insurance company.  Upon information and belief, United does business in Cook County, Illinois.

4.      Defendant Comprehensive Health Management, Inc. ("Comprehensive") is a corporation organized and existing under the laws of Florida, maintaining, at all relevant times, a principal place of business in Tampa, Florida.  Comprehensive is engaged in business as a healthcare insurance company.  Upon information and belief, Comprehensive does business in Cook County, Illinois.

5.      The Medicare Prescription Drug Improvement and Modernization Act of 2003 created a new Medicare prescription drug benefit (commonly known as "Part D"), which is administered by the Centers for Medicare and Medicaid Services ("CMS").  Under Part D, private at-risk prescription drug plans ("Part D Plans") function as payors for the prescription drug benefits of patients enrolled in the given Part D Plan.  WHI is a pharmacy benefit manager ("PBM") which processes and pays pharmacy claims on behalf of several Part D Plans.

6.      To be approved by CMS, a Part D Plan must meet certain minimum requirements, such as showing it has an adequate network of pharmacies.  Part D Plans, or PBMs acting on their behalf, thus routinely contract with Omnicare to serve as an institutional pharmacy for their members.  Pursuant to these contracts, Omnicare is reimbursed by the PBM or Part D Plan for the pharmacy services it provides to their members.

7.      Each Part D Plan has its own computerized processing system or provides a protocol to its PBM for claims processing.  The Part D Plans program these systems or design their protocols to process claims in a way that is consistent with the breadth of Part D coverage.

2

Whenever there are changes to Part D coverage or updates from CMS regarding the treatment of certain claims, Part D Plans must update their processing systems or protocols accordingly. These instructions for handling of various classes of claims are sometimes referred to as "edits."

8.    Many enrollees in Part D Plans are "institutionalized full subsidy eligible individuals" under the CMS regulations for Part D.    Primarily nursing home residents, these individuals are enrolled in both a state Medicaid program and a Medicare Part D Plan.    Their dual enrollment in Medicare and Medicaid exempts them from the "cost-sharing" amounts that would otherwise be payable by beneficiaries under a Part D Plan, such as deductibles, co-payments or coinsurance amounts.    Instead, CMS provides cost-sharing subsidies to Part D Plans to cover these amounts.

9.    By law, if a Part D Plan (including any PBM acting on its behalf) specifies that institutionalized full subsidy eligible individuals must pay cost-sharing when it processes their pharmacy claims, it must pay these individuals any cost-sharing that it withheld.  (See 42 C.F.R. 423.800(c).)    Many LTC pharmacies have not collected cost-sharing amounts from institutionalized full subsidy eligible individuals who are residents of nursing homes and other LTC facilities.    Consequently, these LTC pharmacies are left holding receivables for the services they rendered to those individuals.    Recognizing the difficulty of collecting cost-sharing from patients in nursing homes and LTC facilities, CMS has directed Part D Plans to pay the specified cost-sharing amounts they withheld directly to LTC pharmacies that have not collected cost-sharing amounts from such beneficiaries and are holding receivables for those amounts.

10.    On July 29, 2005, Omnicare and WHI entered into a written contract denominated Pharmacy Network Agreement ("Agreement") by which Omnicare agreed to provide pharmaceutical products and services to members of Part D Plans and Plan Sponsors listed in

Exhibit A to the Agreement. United and an affiliate of Comprehensive are among the Part D Plans and Plan Sponsors listed in Exhibit A that contracted with WHI to process and pay their claims. A copy of the Agreement has been filed under seal with this Court.

11.    In return for the provision of drugs and services, WHI agreed to pay Omnicare for prescription claims approved by WHI at the prices specified on Schedule 3.1(a) to the Agreement, and to perform its obligations under the Agreement in conformance with the Part D Rules, including "CMS instructions, and CMS published sub-regulatory guidance relating to the Part D prescription drug benefit...."  (See Section 3.1(a), Section 5.1, Section 5.3, and the definition of "Part D Rules" in Article 1.)

12.    Thus WHI played two roles in this transaction: PBM and agent. First, as a PBM, WHI is contractually bound to appropriately process claims submitted by Omnicare and remit payment to Omnicare for the claims it approves.  Second, as agent for United and Comprehensive (and the other Part D Plans and Plan Sponsors listed in Exhibit A to the contract), WHI entered into a contract on their behalf by which WHI is bound to reimburse Omnicare for the drugs and services that Omnicare agreed to provide to the Part D Plans' members.

13.    During the period of January 1, 2006, through May 16, 2008, Omnicare provided prescription drugs to institutionalized full subsidy eligible beneficiaries of the Part D Plans covered by the Agreement for which WHI approved the prescription claim but withheld a cost-sharing amount.  Omnicare did not collect these cost-sharing amounts from the beneficiaries or any other source, and currently holds a receivable for these amounts.  In accordance with the terms of the Agreement and the applicable Part D Rules, WHI is obligated to pay these withheld

4

cost-sharing amounts to Omnicare, but, despite demand, has failed to make such payments in full.

14.    WHI breached the Agreement by failing and refusing to pay Omnicare the withheld cost-sharing amounts.

15.    WHI's breaches are ongoing.

16.    As a result of WHI's failure to pay these cost-sharing amounts to Omnicare, for the period January 1, 2006, through May 24, 2008, WHI owes Omnicare an amount in excess of $1,643,131.21.

17.    Omnicare has performed all of the terms of the Agreement to be performed by it and all conditions precedent to WHI's obligation to pay Omnicare the withheld cost-sharing amounts.

18.    WHI's breach of the Agreement has caused Omnicare injury and damages in an amount in excess of $1,643,131.21.

## COUNT II

### (Breach of Contract For Failure To Update Cost-Sharing Database Against All Defendants)

19.    Omnicare realleges and incorporates in this Count II each of the allegations contained in paragraphs 1 through 12 of Count I, and additionally alleges or alleges in the alternative:

20.    When Medicare Part D was initially launched, CMS intended to inform plan sponsors, or PBMs acting on their behalf, whether individuals qualified as institutionalized full subsidy eligible patients on a scheduled basis.  CMS planned to provide this information from its database in which it stores information vital to determinations of subsidy eligibility.  Since the

rollout of Part D in 2006, however, CMS has admittedly failed to provide and update this eligibility information on a consistent basis.

21.    CMS recognized this problem shortly after the rollout of Part D and issued a memorandum directing Part D Plans, or PBMs acting on their behalf, to obtain the necessary information from nursing facilities or advocates acting on behalf of beneficiaries to ascertain their eligibility status so as to correct this improper co-pay assessment.  This information, which must be submitted by Part D Plans in order to receive reimbursement from Part D, is called Best Available Data or Best Available Evidence (hereinafter, "BAE").  Specifically, in a May 5, 2006 memorandum, CMS stated that when a Part D Plan has knowledge that "a beneficiary is a full benefit dual eligible, the plan should make changes to its systems to accommodate the revised copayment level."  In several other communications in 2006 and 2007, CMS instructed Part D Plans, or PBMs acting on their behalf, to work out arrangements for collecting BAE in order to stem the tide of improper adjudications of claims for institutionalized full subsidy eligible individuals.

22.    WHI, and United and Comprehensive, through WHI, their agent, have obligations under the Omnicare contract to abide by CMS guidance.  However, they have failed to follow CMS instructions to collect BAE in order to update and correct data about members of their plans.  Their delinquency has exacerbated the flaws in the adjudication process.  Nonetheless they persist in relying upon incomplete or outdated data from CMS.  Consequently, as discussed in Count I, WHI has misadjudicated claims for drugs dispensed to institutionalized full subsidy eligible beneficiaries.

23.    WHI, United, and Comprehensive have breached their contract with Omnicare by refusing to collect, update and/or maintain their member data, as required by CMS, in order to

provide for the correct adjudication of claims for institutionalized full subsidy eligible beneficiaries.

24.     Their breaches are ongoing.

25.     As a result of WHI's, United's, and Comprehensive's failures to follow CMS guidance in regard to maintaining accurate member data, for the period January 1, 2006, through May 24, 2008, WHI, United, and Comprehensive owe Omnicare an amount in excess of $1,643,131.21.

26.     Omnicare has performed all of the terms of the Agreement to be performed by it and all conditions precedent to WHI's, United's, and Comprehensive's obligations to follow CMS guidance for the maintenance of member data.

27.     WHI's, United's and Comprehensive's breaches of the Agreement have caused Omnicare injury and damages in an amount in excess of $1,643,131.21.

## COUNT III

### (Breach of Contract To Reimburse Against WHI)

28.     Omnicare realleges and incorporates in this Count III each of the allegations contained in paragraphs 1 through 7 and 10 through 12 of Count I, and additionally alleges:

29.     Part D places certain restrictions on choice and administration of prescription drugs.  These restrictions were designed foremost to apply in the retail drug context (i.e. where an individual fills his or her own prescription at a retail pharmacy).  However, a portion of Part D beneficiaries are confined to nursing homes or other types of LTC facilities.  Residents of LTC facilities do not fill their prescriptions at retail pharmacies.  Instead, their prescriptions are ordered on their behalf by the facilities in which they reside and filled by an institutional pharmacy such as Omnicare.

7

30.    Part D beneficiaries residing in LTC facilities thus present special challenges to Part D Plans and institutional pharmacies in their administration of Part D.  For example, the Part D program places limitations on the frequency with which an enrollee's prescriptions can be refilled.  However, when individuals are first admitted to a nursing home, they are generally not permitted to bring any of their prescription drugs with them from home.  Because individuals can be admitted to a nursing home at any point in their prescription cycle, the pharmacies servicing nursing homes may need to fill a newly admitted patient's prescriptions immediately, regardless of whether three days or twenty-five days have passed since the patient's prescription was last filled.  The alternative would be for a patient to go unmedicated for days or even weeks.  Another example is when, for a transitional period, LTC pharmacies are given an order for a drug not covered by the formulary set by a specific Part D plan.  In some instances this occurs because upon admission to a LTC facility, individuals may enroll in a new Part D Plan that has drug formularies that are different from the individuals' previous plans.  In other instances, individuals enrolled in a Part D Plan may have been prescribed non-formulary drugs during a hospital stay, but upon discharge from a hospital and re-admission to the LTC facility must revert to their Part D Plan's formularies.  Patients in these situations are often on a number of different medications.  LTC pharmacies thus may be asked to dispense non-covered drugs while new formularies are phased in over a period of months in order to protect patients from the physical shock of switching several drugs at once.

31.    Prior to the implementation of Part D, CMS emphasized the "unique needs of residents of long term care facilities who enroll in a new Part D Plan."  Because such residents are "likely to be receiving multiple medications for which simultaneous changes could significantly impact the condition of the enrollee," CMS encouraged Part D Plans to shape

appropriate policies for transitional prescription drug coverage, calling transition periods of 90 to 180 days "appropriate." (See Information for Part D Sponsors on Requirements for a Transition Process dated March 16, 2005, attached hereto as Exhibit 2.)

32.     After Part D's inception, CMS has continued to recognize that LTC pharmacies frequently face situations where what is best for their patients does not necessarily follow standard Part D protocols. Rather than putting LTC pharmacies in the position of choosing between harming patients and not getting paid, CMS has given its approval to Part D Plans reimbursing LTC pharmacies for drugs they dispense in these unique circumstances despite their variance from the Part D protocols established for retail pharmacies.

33.     In its Question & Answer Clarification dated May 23, 2006, CMS sanctioned differential treatment between "ambulatory" patients and those confined to LTC facilities when "it is appropriate or legally required under our Part D guidance...For example, it is perfectly acceptable for plans to adopt alternative standards applicable only in the LTC setting when clinically justified, legally required, or otherwise justified based on characteristics unique to beneficiaries residing in LTC facilities...." (See CMS Q&A of May 23, 2006, attached hereto as Exhibit 3, emphasis added.)

34.     More specifically, CMS has limited the use of early refill edits (rejections of claims based on refilling too early in the prescription cycle). These edits "cannot be used to limit appropriate and necessary access" to Part D benefits. (See CMS Q&A of April 6, 2006, attached hereto as Exhibit 4.) CMS provides an example of an inappropriate "too soon" edit: Part D Plans must not deny claims for refills to patients upon admission to or discharge from LTC facilities. (Id.)

35.    In its agreement with Omnicare, WHI acknowledged that "certain of the restrictions under the Plans may not be appropriate in the context of Plan Enrollees who are residents of [LTC] Facilities." (See Agreement Section 3.8.)  Accordingly, WHI guaranteed coverage of certain drugs that might otherwise be denied by Part D Plans.  The special circumstances that might require WHI to pay for Omnicare's provision of non-covered drugs, or covered drugs under non-covered circumstances, are described in detail in, *inter alia*, the Agreement's Sections 3.8(c), 3.8(h), and 3.8(i).

36.    In order for WHI to properly adjudicate drugs dispensed under these special circumstances, it agreed to use "commercially reasonable efforts to adjudicate Claims submitted by Omnicare Pharmacies using its On-Line System" in a way consistent with its guarantee of expanded coverage under Section 3.8. (Id.)  Should a claim covered by Section 3.8 be rejected by WHI's On-Line System, meaning the On-Line System improperly rejected the claim as non-payable, WHI must pay the claim within thirty days of Omnicare's written notice of the improper adjudication. (Id.)

37.    During the period of January 1, 2006, through May 16, 2008, Omnicare provided prescription drugs under the special conditions described in Section 3.8 to many of WHI's members.  When Omnicare submitted claims for these prescriptions, WHI's On-Line System improperly adjudicated these claims as non-covered and did not reimburse Omnicare for them (collectively, the "Rejected Claims").  Under the terms of the parties' Agreement, WHI is obligated to pay these claims.

38.    Consistent with Section 3.8 of the Agreement and CMS guidance, Omnicare brought these claims rejected by the On-Line System to WHI's attention and requested payment.

WHI did not pay these claims within thirty days, as contractually required, and continues to withhold payment to Omnicare.

39.    On February 14, 2007, Omnicare notified WHI in writing of its demand that WHI reimburse Omnicare in full for Rejected Claims.  To date, WHI has failed and refused to pay Omnicare the amounts owed with respect to these claims.

40.    WHI's failure to pay Omnicare for Rejected Claims constitutes a breach of the Agreement.

41.    WHI's breaches are ongoing.

42.    As a result of WHI's failure to pay amounts due Omnicare for Rejected Claims, for the period January 1, 2006, through May 24, 2008, WHI owes Omnicare an amount in excess of $431,429.

43.    Omnicare has performed all of the terms of the Agreement to be performed by it and all conditions precedent to WHI's obligation to pay Omnicare.

44.    WHI's breach of the Agreement has caused Omnicare injury and damages in an amount in excess of $431,429.

WHEREFORE, Plaintiff, Omnicare, Inc., demands judgment as follows:

1.    On Count I, against WHI, the amount of $1,643,131.21, with interest, costs, and expenses.

2.    On Count II, against WHI, United, and Comprehensive, the amount of $1,643,131.21, with interest, costs, and expenses.

3.    On Count III, against WHI, the amount of $431,429 with interest, costs, and expenses.

4.     Such other and further relief as to the Court deems just.

Date: June 11, 2008

Omnicare, Inc.

By: _____
One of the Attorneys for Omnicare, Inc.

Richard P. Campbell
Jenner & Block LLP
330 North Wabash Avenue
Chicago, Illinois  60611-7603
Telephone:  312 222-9350
Facsimile:  312 527-0484
Firm I.D. No. 05003

DEWEY & LEBOEUF LLP
Harvey Kurzweil
Brian S. McGrath
1301 Avenue of the Americas
New York, NY 10019-6092
Telephone:  212-259-8000
Facsimile:  212-259-6333

*Of Counsel for Plaintiff Omnicare, Inc.*

## CERTIFICATE OF SERVICE BY U.S. MAIL AND EMAIL

I, Richard P. Campbell, an attorney, certify that I caused the foregoing **Omnicare, Inc.'s Amended Complaint** to be served on all counsel of record by causing the foregoing to be delivered by United States First Class Mail, postage prepaid and via *email* before 5:00 p.m. on June 11, 2008.


_____
Richard P. Campbell
One of the Attorneys for Plaintiff Omnicare, Inc.

# EXHIBIT 3

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2004 WL 755703 (N.D.Ill.)

CNewly Weds Foods, Inc. v. A.M. Todd Group, Inc.
N.D.Ill.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
NEWLY WEDS FOODS, INC., a Delaware
corporation, Plaintiff,
v.
A.M. TODD GROUP, INC., a Michigan corporation,
Defendant.
**No. 03 C 7827.**

Feb. 18, 2004.

Floyd D. Perkins, Ungaretti & Harris, Chicago, IL,
for plaintiff.
John W. Allen, Varnum, Riddering, Schmidt &
Howlett, Kalamazoo, MI, for defendant.

*MEMORANDUM OPINION AND ORDER*

MORAN, Senior J.
*1 Plaintiff Newly Weds Foods, Inc. filed this action
against defendant A.M. Todd Group, Inc. in the
Circuit Court of Cook County, Illinois, alleging
breach of contract. Defendant removed the case to
this court and plaintiff filed a motion to remand,
arguing that the purchase agreement prohibits
removal. For the following reasons, plaintiff's motion
is denied.

Plaintiff's claims concern alleged violations of a
purchase agreement executed by the parties on
October 1, 2000. Section 11.13 of that agreement
provides:

11.13 *Submission to Venue.*Purchaser and Seller
hereby irrevocably submit to the exclusive
jurisdiction of any state court located within the
County of Cook, State of Illinois, or any federal court
within the Northern District of Illinois. Purchaser and
Seller hereby irrevocably acknowledge that (1) the
sole and exclusive appropriate venue for any suit or
proceeding shall be in such a court, (ii) all claims
shall be heard and determined exclusively in such a
court, (iii) any such court shall have exclusive
jurisdiction over the person of Purchaser and Seller

and (iv) each hereby waives any and all objections to
personal or subject matter jurisdiction as they may
relate to an application for such injunctive relief in a
suit or proceeding brought before such a court in
accordance with the provision of this Section 11.13.

Forum selection clauses should be enforced unless
they are unjust or unreasonable. *M/S Bremen v.
Zapata Off-Shore Co.*, 407 U.S. 1, 15, 92 S.Ct. 1907,
32 L.Ed.2d 513 (1972). In some cases, such a clause
may constitute waiver of defendant's right to remove
a suit to federal court. *Newman/Haas Racing v.
Unelko Corp.*, 813 F.Supp. 1345, 1347
(N.D.Ill.1993). Any waiver must be clear and
unequivocal. *Oberweis Dairy, Inc. v. Maplehurst
Farms, Inc.*, 1989 WL 2078, *1 (N.D.Ill.).

Section 11.13 represents the parties' consent to the
jurisdiction of *any* state or federal court within a
geographic region, not the waiver of defendant's right
to remove. See*Newman/Haas*, 813 F.Supp. at 1347.
There are innumerable ways the parties could have
used the forum selection to limit defendant's right to
remove, yet they failed to do so. See*Euzzino v.
London & Edinburgh Ins. Co. Ltd.*, 228 F.Supp. 431
(N.D.Ill.1964) (holding that a clause explicitly stating
that defendant must submit to jurisdiction at the
request of the plaintiff constitutes a waiver of the
right to remove). Clauses (iii) and (iv) do not change
this result. Clause (iii) simply prohibits a party from
filing a competing lawsuit in another jurisdiction with
the goal of circumventing the choice-of-venue clause,
and clause (iv) deals solely with suits for injunctive
relief, eliminating the defense of lack of personal
jurisdiction. These clauses cannot be construed as
demonstrating an unequivocal waiver by defendant of
its right to remove a lawsuit to federal court.

The cases upon which plaintiff relies are easily
distinguishable. In *Waters v. Browning-Ferris
Industries, Inc.*, 252 F.3d 796 (5th Cir.2001), the court
found that a similar clause constituted a knowing
waiver of the right to remove. The clause in *Waters*,
however, explicitly stated that the "Company" (the
defendant in the case) irrevocably agreed to
jurisdiction in the venue chosen by the plaintiff. *Id.* at
797.The venue clause in the present case binds *both*
parties to Illinois rather than allowing one party to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 755703 (N.D.Ill.)

choose the forum. Moreover, as Judge Garza wrote in dissent, the "contract simply does not address whether the suit should be adjudicated ultimately in federal or state court." *Id.* at 798.

*2 Likewise, in *Snapper, Inc. v. Redan,* 171 F.3d 1249 (11th Cir.1999), the court determined that the defendants had waived their right of removal. Again, that specific clause was much more restrictive, granting to the plaintiff the exclusive right to choose the forum. *Id.* at 1260. The defendants also expressly waived *all* rights based on their residency, which the court found included the right to remove as well as the right to object to personal jurisdiction. *Id.* As stated above, there is no such waiver of rights at issue here. Instead, the contract simply places a reasonable restriction on the location of the litigation.

### CONCLUSION

For the foregoing reasons, plaintiff's motion to remand is denied.

N.D.Ill.,2004.
Newly Weds Foods, Inc. v. A.M. Todd Group, Inc.
Not Reported in F.Supp.2d, 2004 WL 755703 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy                                                    Page 1
Slip Copy, 2008 WL 2130472 (C.A.6 (Mich.))
**(Not Selected for publication in the Federal Reporter)**

**H**EBI-Detroit, Inc. v. City of Detroit
C.A.6 (Mich.),2008.
Only the Westlaw citation is currently available.This
case was not selected for publication in the Federal
Reporter.Not for Publication in West's Federal
Reporter See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also Sixth Circuit
Rule 28. (Find CTA6 Rule 28)
    United States Court of Appeals,Sixth Circuit.
        EBI-DETROIT, INC., Plaintiff-Appellant,
                          v.
    CITY OF DETROIT, Detroit Water And Sewer
    Department, Gary Fujita, Victor Mercado, Kwame
    Kilpatrick, individually and in his capacity as Mayor
    of Detroit, Defendants-Appellees.
                    No. 07-1391.

                    May 22, 2008.

**Background:** Unsuccessful bidder on city public
works contract brought action in state court against
city, its water and sewer department, and the mayor,
alleging breach of contract, defamation, interference
with business relationships and contracts, failure to
follow    procedural    rules,    and    negligent
misrepresentation. Defendants obtained removal. The
United States District Court for the Eastern District
of Michigan, 476 F.Supp.2d 651,Feikens, J., granted
defendants' motion for summary judgment. Bidder
appealed.

**Holdings:** The Court of Appeals, Boggs, Chief
Judge, held that:
(1) removal was warranted on grounds of federal
question jurisdiction;
(2) bidder lacked standing to sue for breach of
contract;
(3) letter notifying other bidders that unsuccessful
bidder was non-responsible did not give rise to
defamation claim;
(4) bidder failed to establish tortious interference; and
(5) recusal of district court judge was not warranted.

Affirmed.

**[1] Removal of Cases 334 ☞19(1)**

334 Removal of Cases
    334II Origin, Nature, and Subject of Controversy
        334k19 Cases Arising Under Laws of United
States
            334k19(1) k. In General. Most Cited Cases
Unsuccessful bidder's state court action against city,
its water and sewer department, and mayor, arose
under federal law, so as to entitle defendants to
removal of action to federal court on grounds of
federal question jurisdiction; bidder's action
contended that mayor violated his powers as a special
master over water and sewer department pursuant to
federal court order. 28 U.S.C.A. §§ 1331, 1441(b).

**[2] Removal of Cases 334 ☞17**

334 Removal of Cases
    334I Power to Remove and Right of Removal in
General
        334k17 k. Waiver of Right. Most Cited Cases
Forum-selection clause in unsuccessful bidder's
bidding documents with city, water and sewer
department, and mayor, whereby bidder agreed to
submit to exclusive personal jurisdiction of
competent state court in Michigan, did not constitute
a waiver of defendants right to removal to federal
court; clause did not even mention either removal or
the defendants seeking removal. 28 U.S.C.A. §
1441(b).

**[3] Municipal Corporations 268 ☞336(1)**

268 Municipal Corporations
    268IX Public Improvements
        268IX(C) Contracts
            268k334 Acceptance or Rejection of
Proposals or Bids
                268k336 Award to Lowest Bidder
                    268k336(1) k. In General. Most
Cited Cases
Unsuccessful bidder on sewer facility contract lacked
standing to sue city, its water and sewer department,
and the mayor for breach of contract, arising out of
defendants' failure to provide bidder with an
opportunity to be heard at a board meeting following
its filing of a protest, where bidder was never

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                 Page 2
Slip Copy, 2008 WL 2130472 (C.A.6 (Mich.))
**(Not Selected for publication in the Federal Reporter)**

awarded the contract and mayor had unlimited discretion in awarding contracts in order to comply with an Environmental Protection Agency (EPA) consent decree. U.S.C.A. Const.Amend. 14.

**[4] Municipal Corporations 268 &#8359;747(1)**

268 Municipal Corporations
    268XII Torts
        268XII(B) Acts or Omissions of Officers or Agents
            268k747 Particular Officers and Official Acts
                268k747(1) k. In General. Most Cited Cases
City and its water and sewer department were immune, under Michigan law, from liability for unsuccessful bidder's state-law claims for defamation and tortious interference, arising out of denial of sewer facility contract to bidder. M.C.L.A. Const. Art. 7, § 24; M.C.L.A. § 691.1407(1).

**[5] Municipal Corporations 268 &#8359;170**

268 Municipal Corporations
    268V Officers, Agents, and Employees
        268V(A) Municipal Officers in General
            268k170 k. Duties and Liabilities. Most Cited Cases
Denial of sewer facility contract to unsuccessful bidder, based upon a finding that bidder was not "responsible," by mayor and director of city water and sewer department was within both mayor and director's authority as the highest official of their respective level of government, so as to entitle them, under Michigan law, to absolute immunity from liability in unsuccessful bidder's defamation and tortious interference claims. M.C.L.A. § 691.1407(5).

**[6] Libel and Slander 237 &#8359;36**

237 Libel and Slander
    237II Privileged Communications, and Malice Therein
        237k35 Absolute Privilege
            237k36 k. In General. Most Cited Cases
Letter notifying other bidders that unsuccessful bidder was non-responsible based on performance on a prior project was not an unprivileged communication to a third party, as element of

unsuccessful bidder's defamation claim against city defendants under Michigan law; bidder consented to the communication by submitting a bid under bidding documents that plainly stated that if a bidder was disqualified, both the disqualification and the reasons for the disqualification would be sent to other bidders.

**[7] Torts 379 &#8359;241**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)2 Particular Cases
                379k241 k. Business Relations or Economic Advantage, in General. Most Cited Cases
Unsuccessful bidder's alleged "valid promissory relationship" with city water and sewer department as to sewer facility contract did not constitute the type of relationship that could give rise to a tortious interference claim, under Michigan law, allegedly arising out of director and deputy director's interference with the relationship.

**[8] Municipal Corporations 268 &#8359;336(1)**

268 Municipal Corporations
    268IX Public Improvements
        268IX(C) Contracts
            268k334 Acceptance or Rejection of Proposals or Bids
            268k336 Award to Lowest Bidder
                268k336(1) k. In General. Most Cited Cases
Mayor did not exceed his powers as special administrator of city water and sewer department, pursuant to federal court order appointing mayor as special administrator with power to enter into and perform all contractual obligations, when he awarded sewer facility contract to contractor other than unsuccessful bidder; mayor specifically invoked the power and explained that the order was necessary to ensure that department complied with Environmental Protection Agency (EPA) consent decree.

**[9] Judges 227 &#8359;49(1)**

227 Judges
    227IV Disqualification to Act
        227k49 Bias and Prejudice

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                                      Page 3
Slip Copy, 2008 WL 2130472 (C.A.6 (Mich.))
(Not Selected for publication in the Federal Reporter)

227k49(1) k. In General. <u>Most Cited Cases</u>
District court judge's knowledge of, and relationship with, city water and sewer department, which arose solely from his judicial role in overseeing consent decree with Environmental Protection Agency (EPA), did not constitute personal or extrajudicial bias, as required to justify recusal in unsuccessful bidder's action against city defendants, arising out of city's denial of sewer facility contract in favor of bidder.

On Appeal from the United States District Court for the Eastern District of Michigan.

Before <u>BOGGS</u>, Chief Judge; <u>ROGERS</u>, Circuit Judge; and SHADUR, <u>FN*</u> District Judge.

<u>BOGGS</u>, Chief Judge.
*1 Construction contractor EBI-Detroit appeals the district court's grant of summary judgment in favor of the City of Detroit, the Detroit Water and Sewer Department ("DWSD"), Gary Victor Mercado, two directors of DW SD, and Detroit's mayor, Kwame Kilpatrick. EBI claims that the defendants breached a contract and committed various intentional torts when they rejected EBI's bid on a DWSD project. The threshold question in this case is whether federal jurisdiction exists. We conclude that it does. EBI's allegation that Kilpatrick acted outside the powers granted to him by a federal court requires us to interpret the federal court order and thus presents a federal question. The second, easier question is whether EBI's claims can survive summary judgment. We conclude that they cannot, and therefore affirm.

I

Our jurisdiction turns on Kilpatrick's appointment as "Special Administrator" of DWSD under a consent decree between DWSD and the EPA, so we summarize the extended litigation between those two parties. Thirty-one years ago, in 1977, the United States sued DWSD over DWSD's noncompliance with the Clean Water Act ("EPA Case"). In September 1977, the parties entered a consent decree establishing a compliance schedule for bringing DWSD's wastewater treatment and pollution discharges in line with the Clean Water Act. District Judge Feikens oversaw the initial consent decree, and he has continued to oversee the litigation surrounding DWSD and the EPA to this day. In 1979, Judge Feikens found that DWSD was not following the compliance schedule and appointed Coleman Young, the mayor of Detroit, as "Special Administrator" of the DWSD. <u>United States v. City of Detroit, 476 F.Supp. 512 (E.D.Mich.1979)</u>. This appointment gave the mayor power to "exercise extraordinary remedies in control, management, and operation of the Wastewater Treatment Plant" to ensure DWSD's compliance, <u>id.</u> at 515, and allowed him "to enter into such contracts as he deems necessary and appropriate under the circumstances, with or without competitive bidding."<u>Id.</u> at 516.

Since the initial consent decree, DWSD has drifted in and out of compliance with the Clean Water Act. During periods of compliance, Judge Feikens "temporarily suspended the Special Administratorship," only to "revive" it when "compliance with the Clean Water Act or the Consent Judgments in this case was at risk."<u>United States v. Michigan, 409 F.Supp.2d 883, 886 (E.D.Mich.2006)</u> (Feikens, J.). In August 1997, DWSD acknowledged that it was once again operating in violation of EPA regulations. Judge Feikens appointed a committee to investigate DWSD's noncompliance. The committee issued its report in January 2000, and the court again responded by appointing Detroit's mayor, Dennis Archer, as Special Administrator of DWSD. The court gave Archer the same powers it gave to Mayor Young in 1979. <u>United States v. City of Detroit, No. 77-71100, 2000 WL 371795 (E.D.Mich. Feb.7, 2000)</u>. DWSD's contracts were "subject to the requirement of competitive bidding," but the mayor could waive the bidding rules when he deemed it "necessary." <u>Id.</u> at * 5. On December 3, 2001, the court transferred the authority of the Special Administrator to Detroit's new mayor, Kwame Kilpatrick.

*2 This case arises from DWSD's rejection of EBI's bid on Contract PC-753, the Belle Isle Pump Station and Combined Sewer Overflow Control Improvements Project (the "Belle Isle Project"). The parties agree that the Belle Isle Project is required by DWSD's EPA permit. DWSD's Assistant Director Gary Fujita stated that the Belle Isle Project needed to be completed on a tight timetable to ensure compliance with the EPA's consent decree. DWSD solicited bids on the Belle Isle Project, and, after equalization, the two lowest bids came from EBI, at

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 2130472 (C.A.6 (Mich.))
**(Not Selected for publication in the Federal Reporter)**

Page 4

$13,265,009, and from Walsh Construction, at $13,588,680.[FN1]

DWSD made it clear that the Belle Isle Project would be awarded to the lowest bidder who was both *responsive* and *responsible,* "responsive" meaning that the bidder submitted a timely bid that conformed to DWSD's request, and "responsible" meaning that the bidder's record suggested that it could be expected to complete the project on time and in compliance with all relevant laws. DWSD sent EBI a letter on January 28, 2005, telling EBI that it was the lowest responsive bidder and that it needed to submit certain documents to prove that it was responsible. On February 4, 2005, EBI attended a bid evaluation meeting where EBI and DWSD discussed the items that EBI needed to submit. On March 21, 2005, DWSD's director, Victor Mercado, sent EBI a letter stating that due to EBI's deficient performance on an earlier project, the LH-391 Project, DWSD was deeming EBI a non-responsible bidder and awarding the contract to another bidder.

The LH-391 Project was also required by the consent decree, and EBI was the design/build contractor for that project. While the LH-391 Project is not at issue in this case, it is relevant because EBI's performance on it prompted DWSD to reject EBI's bid on the Belle Isle Project. Both parties agree that serious problems arose on the LH-391 Project. It was supposed to be substantially completed by June 21, 2004, but was not substantially completed until July 2005. As expected, EBI and the defendants disagree over the source of the problems. EBI devotes three pages of its brief to explaining how the defendants falsely blamed EBI for problems that they created. The Defendants counter by pointing the finger at EBI. They also argue that because EBI has already sued DWSD in state court over the LH-391 Project, it should not be allowed to litigate the LH-391 Project in this case as well.

EBI responded to the rejection of its bid on the Belle Isle Project on March 29, 2005, by sending a letter claiming that the decision was unfair and requesting a protest hearing. Sections 13.2 and 13.3 of the bidding document state that if a bid is rejected, the bidder may file a protest, and DWSD will review the protest and "if necessary" hold a hearing on the matter within ten days. DWSD sent EBI a letter on April 19 pointing out the permissive nature of its hearing

obligations and informing EBI that DWSD had determined that a hearing was not necessary. Instead, on June 9 Kilpatrick invoked his powers as Special Administrator of DWSD and awarded the contract to Walsh Construction.

*3 EBI sued the defendants on September 25, 2006, in Wayne County Circuit Court, asserting claims for breach of contract, defamation, tortious interference, and "abuse of power by the Special Administrator" against Kilpatrick. On October 11, 2006, the defendants removed the case to federal court. The case was initially assigned to Judge Paul Gadola, but it was reassigned on November 1, 2006, to Judge Feikens in light of his role in overseeing DWSD. EBI filed a motion to remand the case to state court on October 30, but it was denied on December 6.

The defendants filed a motion for summary judgment on December 27, and on April 25, 2007, the district court granted the motion. Judge Feikens reasoned that EBI was merely a disappointed bidder and lacked standing to assert any of its claims. EBI appealed.

II

A

The first question in this case is whether we have subject matter jurisdiction, an issue we review de novo. *Taveras v. Taveras,* 477 F.3d 767, 771 (6th Cir.2007).

B

The bedrock principle of the federal judicial system is that federal courts are courts of limited jurisdiction. For a federal court to have jurisdiction over a case, "[t]he Constitution must have given to the court the capacity to take it, and an act of Congress must have supplied it."*Finley v. United States,* 490 U.S. 545, 548, 109 S.Ct. 2003, 104 L.Ed.2d 593 (2003) (quoting *Mayor v. Cooper,* 6 Wall. 247, 252, 18 L.Ed. 851 (1868)). Generally speaking, the Constitution and Congress have given federal courts authority to hear a case only when the case raises a federal question or when diversity of citizenship exists between the parties. *Caterpillar Inc. v. Williams,* 482 U.S. 386, 392, 107 S.Ct. 2425, 96

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                   Page 5
Slip Copy, 2008 WL 2130472 (C.A.6 (Mich.))
**(Not Selected for publication in the Federal Reporter)**

L.Ed.2d 318 (1987). The federal question must appear on the face of the plaintiff's well-pleaded complaint. *Ibid.; see also Louisville & Nashville R.R. Co. v. Mottley,* 211 U.S. 149, 150, 29 S.Ct. 42, 53 L.Ed. 126 (1908). When a case raising a federal question is filed in state court, the defendant may remove it to federal court if the case could have been filed in federal court. *Caterpillar Inc.,* 482 U .S. at 392. Thus, a plaintiff may avoid federal question jurisdiction by relying exclusively on state law. *Ibid.* EBI argues that it did so and that its complaint relies solely on state law.

The defendants counter by invoking 28 U.S.C. § 1442, which allows federal officers who are civilly sued or criminally prosecuted for actions taken "under color" of their office to remove the case to federal court even if no federal question appears on the face of the plaintiff's complaint. *Mesa v. California,* 489 U.S. 121, 125-26, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989).*Mesa* explained that removal under § 1442(a) is proper when: 1) the defendant is a federal officer within the meaning of the statute; 2) there is a causal connection between what the officer has done under asserted federal authority and the state lawsuit; and 3) the officer presents a colorable defense arising from his duty to enforce federal law. *Mesa,* 489 U.S. at 132-33. The defendants say that federal jurisdiction exists under § 1442(a) because: 1) Kilpatrick is "an officer of the courts of the United States" because of his federally-appointed position as Special Administrator; 2) a causal connection exists because he is being sued for an action that the Special Administrator may take; and 3) he has a federal defense because as Special Administrator, he may circumvent the bidding process to enforce the consent decree.

*4 It seems likely that Kilpatrick is a "federal officer" because of his appointment as Special Administrator and that he has "a colorable federal defense" because of his powers as Special Administrator. However, we question the defendants' ability to establish a "causal connection" between Kilpatrick's actions under federal authority and the lawsuit. Other courts have considered § 1442(a) in the context of a state official's attempted compliance with a federal consent decree or court order, and they have held that the state official establishes the necessary "causal connection," and is transformed into a "federal officer," only when his actions are "explicitly

mandated or necessarily required" by the court order or consent decree with which he seeks to comply. *See, e.g., In re County Collector of the County of Winnebago, Ill .,* 96 F.3d 890, 898 (7th Cir.1996). It is not clear that Kilpatrick's actions were "explicitly mandated" or "necessarily required" by the consent decree. But we need not resolve this issue because even if the defendants cannot establish federal jurisdiction through the somewhat unusual means of Kilpatrick's status as a "federal officer," [FN2] EBI's own complaint establishes routine federal question jurisdiction under 28 U.S.C. § 1331.

C

[1]Section 1331 creates federal jurisdiction for all lawsuits "arising under the Constitution, laws, or treaties of the United States."28 U.S.C. § 1331. In turn, 28 U.S.C. § 1441(b) allows a defendant to remove such a case to federal court. The "laws" of the United States include the orders issued by the federal courts. In the vast majority of cases, a claim "arises under" federal law when federal law provides a right to relief. *Eastman v. Marine Mech. Corp.,* 438 F.3d 544, 550 (6th Cir.2006) (citing *Am. Well Works Co. v. Layne & Bowler Co.* 241 U.S. 257, 260, 36 S.Ct. 585, 60 L.Ed. 987 (1916)). Federal law provides EBI's right to relief here because EBI's complaint alleges that Kilpatrick violated the federal court order appointing him Special Administrator of the DWSD.

EBI's allegation that Kilpatrick violated federal law appears on the face of EBI's complaint. The complaint states that:

> 99. Mr. Kilpatrick's actions awarding the Project to another contractor without seeking approval of the City Council *constituted a violation of his powers as Special Master* [Administrator].

> 100. Such disregard by the Mayor of Detroit constitutes an improper use of enumerated powers and as such *Mr. Kilpatrick's actions are ultra vires.*

> ...

> 107. Mayor Kilpatrick's actions awarding the Project contract to another contractor without consulting the City Council *violated his powers as*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                    Page 6
Slip Copy, 2008 WL 2130472 (C.A.6 (Mich.))
**(Not Selected for publication in the Federal Reporter)**

*Special Master* [Administrator].

...

116. Mr. Kilpatrick's actions *abused the Special Master* [Administrator] *power granted by Judge Feikens because the awarding of this Project is outside the boundaries of Mr. Kilpatrick's power* and contrary to the provisions of the Contract Documents (emphases added).

*5 EBI even labels count 14 of its complaint "Willful Violation and Abuse of Power as Special Master of DWSD." Therefore, EBI's "right to relief" against Kilpatrick turns on whether Kilpatrick exceeded the authority granted to him by the federal court order. The order was issued by a federal court, and therefore the interpretation of that order is a question of federal law. EBI cannot recover under count 14 of its complaint unless Kilpatrick violated federal law, so we have a classic federal question and therefore subject matter jurisdiction.

EBI attempts to avoid jurisdiction in two ways. First, at oral argument, its counsel asked us to look to the "substance" of EBI's complaint and find no federal jurisdiction. This is an ambiguous request. If EBI means that we should look at the words of EBI's complaint and see what legal violations are alleged, that is what we are doing. EBI alleged in count 14 that Kilpatrick *broke federal law* by exceeding his powers as Special Administrator, and it is this substantive legal allegation that creates jurisdiction. But if EBI means that we should find no jurisdiction because most of its claims are state-law claims, we reject this suggestion because when a complaint raises a single federal question, federal courts have jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."28 U.S.C. § 1367(a). EBI primarily raised state-law claims, but EBI's allegation that Kilpatrick broke federal law brings the entire case into federal court because all of EBI's claims are part of the same "case or controversy."

[2] Second, EBI points to a forum-selection clause in the bidding documents. The clause states:

15.4.1 The Contractor [EBI] agrees to submit to the

exclusive personal jurisdiction of, and not commence any action in other than, a competent State court in Michigan, regardless of residence or domicile, for any action or suit in law or equity arising out of or under the Contract Documents.

The clause is irrelevant because it says nothing about the defendants' right to remove. Indeed, it does not mention any of the defendants at all. Our circuit has held that any waiver of the right to remove must be "clear and unequivocal." *Regis Ass'n. v. Rank Hotels Ltd.*, 894 F.2d 193, 195 (6th Cir.1990). A clause that does not even mention either removal or the party seeking to remove cannot be a clear waiver of removal.FN2

EBI wants to be in state court, but that desire is not enough to avoid federal jurisdiction. While as the plaintiff EBI enjoys the long-established right to "decide what law he will rely upon,"*Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25, 33 S.Ct. 410, 57 L.Ed. 716 (1913), that right does not allow EBI to escape the consequences of claiming that the defendants violated a federal court order. In another context we observed that "[n]othing prevents a plaintiff from pleading itself out of court, which is all that happened here."*NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 458 (6th Cir.2007) (en banc). The reverse is also true. Nothing prevents a plaintiff from inadvertently pleading so as to subject itself to removal into federal court, and that is what happened here.

III

A

*6 Having found jurisdiction, we turn now to the merits of EBI's case. The district court granted summary judgment to the defendants. We review grants of summary judgment de novo under the familiar standard of Federal Rule of Civil Procedure 56 and *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).*Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 521 (6th Cir.2008).

B

[3] Count 1 of EBI's complaint alleges that DWSD

Slip Copy
Slip Copy, 2008 WL 2130472 (C.A.6 (Mich.))
**(Not Selected for publication in the Federal Reporter)**

Page 7

breached a contract with EBI. But despite its best efforts, EBI cannot hide the fact that *it never signed a contract with DWSD.* Indeed, this dispute is in court precisely because Walsh Construction, not EBI, received the contract. The letter informing EBI that it was the lowest bidder told EBI that no contract had yet been awarded and that EBI would receive the contract only if it were found to be "responsible ."

EBI knows this. In a letter to Kilpatrick on April 7, 2005, EBI spoke of "delays in formally awarding the contract to EBI."EBI's president admitted in his affidavit that EBI never received the contract. EBI's brief on appeal argues that "while it had not yet been finalized, all other necessary requirements for the formation of a contract had taken place."But this is like saying that while a plaintiff has not yet filed his complaint, all other necessary requirements for the commencement of a lawsuit have taken place. Without a contract to breach, EBI's breach of contract claim cannot stand.

EBI seeks to avoid this inconvenient fact by re-framing its claim. At oral argument before the district court, EBI's counsel contended that the parties' agreement "was not a contract to give us the job ...; it was a contract to abide by the terms of the proposal."EBI insists that the parties agreed to abide by the bidding document, and that the defendants violated the bidding document by not holding a hearing on EBI's protest, and by not allowing EBI the opportunity to be heard at a DW SD board meeting. A glance at the bidding document disposes of EBI's first contention because the bidding document says that DWSD alone decides whether to hold a hearing. The second contention requires more consideration because while the bidding document states that a disappointed bidder who files a protest "will be given an opportunity to be heard at the Board meeting," no Board meeting was held. But EBI still loses because disappointed bidders have no standing to bring claims based on a violation of bidding procedures.

We reviewed the law surrounding standing and disappointed bidders in *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby,* 470 F.3d 286 (6th Cir.2006).*Club Italia* held that absent a statutory exception, "a disappointed bidder does not have standing before this court."*Id.* at 293.Cases prior to *Club Italia* consistently refused to allow disappointed bidders [FN4] to bring claims for violations of the

bidding procedures. *See, e.g., Expert Masonry, Inc. v. Boone County, Kentucky,* 440 F.3d 336, 348 (6th Cir.2006) (disappointed bidder suffered no cognizable antitrust injury); *Leo J. Brielmaier Co. v. Newport Housing Auth.,* 173 F.3d 855 (table), 1999 WL 236193, at *5 (6th Cir.1999) (disappointed bidder lacked standing to assert constitutional due process claim); *United of Omaha Life Ins. Co. v. Solomon,* 960 F.2d 31, 34 (6th Cir.1992) (per curiam) (disappointed bidder lacked standing). A bidder who, in addition to seeing his bid rejected, is disqualified from bidding on *future* projects may have standing, *Club Italia,* 470 F.3d at 297,*United of Omaha,* 960 F.2d at 34, but EBI cannot obtain standing this way because EBI was not disqualified from bidding on future projects.

*7 EBI's contract claim would fare no better in state court. Michigan courts hold that:

> [O]ne who is unsuccessful in bidding on a public contract does not have standing to challenge the result or the bidding process itself. This rule is based on the belief that statutes or ordinances requiring such bidding procedures for public contracts were adopted to benefit taxpayers or the general public.

*WDG Inv. Co., LLC v. Mich. Dept. of Mgmnt. and Budget,* Case No. 229950, 2002 WL 31424731, at *3 (Mich.Ct.App.2002) (citing *Talbot Paving Co. v. Detroit,* 109 Mich. 657, 67 N.W. 979, 980 (1896)).

United of Omaha is particularly fatal to EBI's claims because it held that a disappointed bidder must show that "it was actually awarded the contract at any procedural stage or that local rules limited the discretion of state officials as to whom the contract should be awarded."United of Omaha, 960 F.2d at 34. EBI cannot meet this test because it was never awarded the contract and because Kilpatrick has unlimited discretion in awarding contracts in order to comply with the EPA consent decree. Like the bidder in United of Omaha, EBI was "obviously disadvantaged" by the government's actions, *id.* at 35, but it nevertheless "retained only a unilateral hope of being awarded the contract, not a right to it."*Ibid.* A "unilateral hope" does not create standing.

C

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                    Page 8
Slip Copy, 2008 WL 2130472 (C.A.6 (Mich.))
**(Not Selected for publication in the Federal Reporter)**

We turn now to EBI's state-law claims for defamation and tortious interference. EBI alleged other torts in its complaint, but raises only these two on appeal. Some confusion exists as to whether EBI alleged defamation against Mercado and Fujita as individuals, against DWSD as an entity, or against both. We will give EBI the benefit of the doubt and assume that it pleaded defamation claims against Mercado, Fujita, and DWSD.

The district court's grant of summary judgment never mentioned EBI's tort claims. The district court based its decision on a disappointed bidder's lack of standing, so we must assume that the district court concluded that EBI lacked standing to raise its intentional tort claims.

We have never determined whether disappointed bidders have standing to bring intentional tort claims, as opposed to breach of contract or constitutional due process and equal protection claims. The argument against granting standing is that doing so would allow disappointed bidders to circumvent the prohibitions on claims arising from the bidding document by pleading their contract claims as intentional tort claims. The argument for granting standing is that government agencies should not be given a free pass to commit intentional torts simply because the victim is a disappointed bidder. Some courts have addressed the issue and granted standing to disappointed bidders in intentional tort cases. *See, e.g., A-Valey Eng'rs. Inc. v. Bd. of Chosen Freeholders of County of Camden*, 106 F.Supp.2d 711, 719 (D.N.J.2000) (tortious interference); *United Prison Equip. Co. v. Bd. of County Comm'rs of Caroline County*, 907 F.Supp. 908, 913 (D.Md.1995) (defamation); *Lacorte v. Hudacs*, 884 F.Supp. 64, 70 (N.D.N.Y.1995) (defamation). Likewise, an unpublished case from our circuit assumed that a disappointed bidder had standing to raise a tortious interference claim. *Leo J. Brielmaier Co.*, 1999 WL 236193 at *7. But we need not definitively answer the standing question now, because even if EBI has standing, its claims fail.

1

**\*8** First, all defendants may be entitled to governmental immunity. We say "may" because while it is clear that DWSD and the City of Detroit, as government agencies engaged in a government function, are entitled to absolute immunity, confusion exists among Michigan courts about whether Michigan's governmental immunity statute covers intentional torts by government employees. The Michigan Supreme Court squarely held that there is "no intentional tort exception to the governmental immunity statute."*Smith v. Dept. of Pub. Health*, 428 Mich. 540, 410 N.W.2d 749, 772 (Mich.1987).*Smith* has not been overruled and has been repeatedly cited by lower Michigan courts as holding that governmental immunity bars intentional tort claims against both government agencies and government employees. *See, e .g., Bell v. Fox*, 206 Mich.App. 522, 522 N.W.2d 869, 871 (Mich.Ct.App.1994) (relying on *Smith* to grant immunity to police officers); *Flones v. Dalman*, 199 Mich.App. 396, 502 N.W.2d 725, 731 (Mich.Ct.App.1993) (same).

Unfortunately, the picture gets more complicated, particularly with respect to lower-level government employees. Several panels of the Michigan Court of Appeals have interpreted *Smith* as holding that governmental immunity shields only state agencies, not state officers, from tort liability. *See, e.g., May v. Greiner*, 2006 WL 2987709, at *3 (Mich.Ct.App.2006) (per curiam) (stating that *Smith* shields only government agencies, not individual government officers, from intentional tort liability); *Sudul v. City of Hamtrack*, 221 Mich.App. 455, 562 N.W.2d 478, 479 (Mich.Ct.App.1997) (holding that "an individual employee's intentional torts are not shielded by our governmental immunity statute"); *see also ibid.* at 489-90 (Murphy, P.J., concurring in part and dissenting in part) (saying that *Smith* is responsible for the confusion and arguing that "an analysis of *Smith* beyond the bare holding reveals" that governmental immunity does not apply to intentional torts committed by police officers).

As a federal court, we look to the Michigan Supreme Court for the authoritative interpretation of Michigan law. *United States v. Philip*, 460 F.3d 729, 732 (6th Cir.2006).*Smith* is a Michigan Supreme Court decision that has not been overruled and as such we are we are bound by it. Yet it is difficult to ignore the uncertainty created by *Smith* and the contradictory interpretations of *Smith* by the Michigan Court of Appeals as we attempt to interpret Michigan law correctly without intruding on the Michigan courts' prerogative to interpret Michigan law. Clarification from the Michigan Supreme Court would be helpful,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                              Page 9
Slip Copy, 2008 WL 2130472 (C.A.6 (Mich.))
**(Not Selected for publication in the Federal Reporter)**

and we are grateful that it appears to be forthcoming.

In January of this year, the Michigan Supreme Court initially declined to hear a case that could have cleared this confusion. *Odom v. Wayne County,* 480 Mich. 1015, 743 N.W.2d 56, 57 (Mich.2008), *reconsideration granted, order vacated by* 480 Mich. 1184, 747 N.W.2d 249, 2008 WL 1851282, at * 1, (Mich. April 25, 2008). Justice Markman dissented from the initial denial, pointing out the contradictory opinions within the Michigan Court of Appeals, and explaining that "[b]ecause the law in this area is in such disarray, I would grant leave to appeal." *Id.* at 57. Just before this opinion was issued, the Michigan Supreme Court vacated its denial of leave to appeal in *Odom,* granted leave to appeal, and asked for briefing on the scope of Michigan's governmental immunity statute. *Odom v. Wayne County,* 480 Mich. 1184, 747 N.W.2d 249, 2008 WL 1851282, at *1, (Mich. April 25, 2008). Fortunately, we need not wait until *Odom* clears up this issue to decide this case because even if governmental immunity does not bar EBI's claims, the claims lack merit.

*9 [4] With that background, we turn to the immunity issue, where we consider first the question of absolute immunity with respect to DWSD and the City of Detroit. Although the defendants did not raise the issue of governmental immunity below, we may affirm if a district court's decision was correct for any reason, even if the reason was "not considered below." *United States Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO,* 330 F.3d 747, 750 (6th Cir.2003); *see also Mack v. City of Detroit,* 467 Mich. 186, 649 N.W.2d 47, 53 (Mich.2000) (defendant's failure to raise governmental immunity defense at trial did not preclude court from considering the defense on appeal). Under Michigan law, governmental immunity is not an affirmative defense, but a characteristic of the government that bars tort liability unless an exception applies. *Mack,* 649 N.W.2d at 53-54. "A governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function." *Ibid.* (citing Mich. Comp. Laws 691.1407(1)). A " '[g]overnmental function' is an activity that is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law." *Ibid.* The Michigan Constitution expressly authorizes cities to maintain water systems like DWSD. Mich. Const. art. 7, § 24.

Furthermore, the Michigan Court of Appeals has explicitly held that Detroit's operation of DWSD is a governmental function. *Davis v. Detroit,* 269 Mich.App. 376, 711 N.W.2d 462, 465 (Mich.Ct.App.2006). Thus, DWSD and the City of Detroit are immune from EBI's tort claims. This immunity is indisputable. All Michigan cases agree that government agencies are immune from liability for intentional torts; the conflict is over the immunity of government officers. *See Sudul,* 562 N.W.2d at 490.

[5] Next, we ask if the individual defendants are entitled to absolute immunity. We answer that under our understanding of Michigan law, Mayor Kilpatrick and Director Mercado are absolutely immune from EBI's tort claims. Michigan's governmental immunity statute says that "the elective or highest appointive executive official of all levels of government are immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her judicial, legislative, or executive authority." Mich. Comp. Laws 691.1407(5). Michigan courts have determined that Mayor Kilpatrick and Director Mercado are covered by this law. *Brown v. Mayor of Detroit,* 271 Mich.App. 692, 723 N.W.2d 464, 481-82 (Mich.Ct.App.2006) (vacated in part on other grounds by *Brown v. Mayor of Detroit,* 478 Mich. 589, 734 N.W.2d 514 (Mich.2007)) (Kilpatrick); *Davis,* 711 N.W.2d at 466 (Mercado).

When a government official covered by MCL 691.1405(5) is acting within the scope of his authority, that official enjoys absolute tort immunity. *Am. Transmissions, Inc. v. Attorney Gen.,* 454 Mich. 135, 560 N.W.2d 50, 52 (Mich.1997). The official's motivation is irrelevant; the only question is whether the act was within the scope of his authority. *Id.* at 53 (no "malevolent-heart" exception to statute). Awarding contracts and determining whether or not a contractor is "responsible" lie within Kilpatrick's and Mercado's authority, so they are immune from suit. Indeed, both *Brown* and *Davis* granted Mercado and Kilpatrick immunity from intentional tort claims pursuant to Mich. Comp. Laws 691.1407(5) and did not mention *Smith.* This suggests to us that as the highest officials of their respective levels of government, their right to immunity is absolute and does not turn on the contradictory interpretations of *Smith.*[FN8]

Slip Copy

Slip Copy, 2008 WL 2130472 (C.A.6 (Mich.))

(Not Selected for publication in the Federal Reporter)

Page 10

**\*10** Whether Deputy Director Fujita also enjoys immunity is closer question. As the *Deputy* Director, he is not the *highest* official at his level of government. While some Michigan courts have been willing to expand absolute immunity to Deputy Directors, others have not. *Compare, e.g., Chivas v. Koehler,* 182 Mich.App. 467, 453 N.W.2d 264, 265 (Mich.Ct.App.1990) (granting immunity to both Director and Deputy Director of the Department of Corrections) *with Taylor v. Bomar-Parker,* 2003 WL 21978753, at *2 (Mich.Ct.App.2003) (stating that trial court granted summary judgment based on absolute immunity to Director, but not to Deputy Director, of Department of Transportation). Given this split in authority, we hesitate to speculate on how the Michigan Supreme Court would rule on Deputy Director Fujita's request for absolute immunity. And given that Michigan law concerning the liability of lower-level governmental employees for intentional torts will remain unclear until the Michigan Supreme Court rules in *Odom,* we hesitate to speculate on his request for qualified immunity under Mich. Comp. Laws 691.1407(2).

2

Fortunately, we need not decide these questions because we hold that even if governmental immunity does not protect one or all of the individual defendants, EBI's tort claims lack merit. EBI claims that Mercado and Fujita defamed EBI by declaring that EBI was "non-responsible" based on its performance on the LH-391 Project, and by communicating that declaration of non-responsibility to other area contractors. It alleges that this statement was "knowingly false" because Mercado and Fujita knew that DWSD, not EBI, was responsible for the problems with the LH-391 Project.

[6] Under Michigan law, "[t]he elements of a defamation claim are: (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication."*Mitan v. Campbell,* 474 Mich. 21, 706 N.W.2d 420, 421 (Mich.2005). EBI cannot prove the second element. Defamation requires an unprivileged communication, but the only communication EBI

points to is the letter notifying the other bidders that EBI was non-responsible. This communication was privileged because EBI consented to this communication by submitting a bid under bidding documents that plainly stated that if a bidder was disqualified, both the disqualification and the reasons for the disqualification would be sent to other bidders. *See Merritt v. Detroit Mem. 'l Hosp.,* 81 Mich.App. 279, 265 N.W.2d 124, 127 (Mich.Ct.App.1978) (statements consented to are privileged).

[7] EBI also claims that Mercado and Fujita tortiously interfered with EBI's business relationship with DWSD. Under Michigan law, the elements of a tortious interference claim are: "(1) [t]he existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy by the interferer, (3) an intentional and wrongful interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage to the party whose relationship or expectancy was disrupted."*PT Today, Inc. v. Comm 'r of the Office of Fin. & Ins. Servs.,* 270 Mich.App. 110, 715 N.W.2d 398, 422 (Mich.Ct.App.2006).

**\*11** EBI claims that it had a "valid promissory relationship" with DWSD, and that defendants Mercado and Fujita interfered with this relationship. The court cannot find a single legal authority that even contains the phrase "valid promissory relationship," let alone one that defines the phrase or says that a "valid promissory relationship" can form the basis of a tortious interference claim. But however one describes EBI's relationship with DWSD, it is not the kind of relationship that can support a tortious interference claim. Michigan courts have already rejected the idea that a disappointed bidder has a valid business expectancy in a potential government contract. *Timmons v. Bone,* 2002 WL 745089, at *2 (Mich.Ct.App. April 3, 2002). We agree, and note that holding otherwise would give any low responsive bidder an immediate business expectancy in the government contract at issue. EBI had a "unilateral hope" of winning the contract, nothing more, so its tortious interference claim cannot proceed. *United of Omaha,* 960 F.2d at 35;*see also NBT Bancorp, Inc. v. Fleet/Norstar Fin. Group, Inc.,* 87 N.Y.2d 614, 641 N.Y.S.2d 581, 664 N.E.2d 492, 497 (N.Y.1996) (disappointed bidder in merger could not bring tortious interference suit because it

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 2130472 (C.A.6 (Mich.))
**(Not Selected for publication in the Federal Reporter)**

had only an expectation of contractual relations).

### D

[8] Finally, we come to EBI's contention that Kilpatrick exceeded his powers as Special Administrator of the DWSD. As mentioned earlier, Judge Feikens's order appointing Kilpatrick Special Administrator of the DWSD gave Kilpatrick control over the "entering into and performance of all contractual obligations of the system related to the wastewater treatment plant."*United States v. City of Detroit,* 2000 WL 371795 at * 5. The same order gave Kilpatrick power to "waive" the competitive bidding requirements if he deemed it "necessary." *Ibid.*

When Kilpatrick authorized Mercado and DWSD to award the Belle Isle Project to Walsh Construction instead of EBI, Kilpatrick specifically invoked this power and explained that the order was necessary to "ensure that DWSD complies" with the consent decree. Nevertheless, count 14 of EBI's complaint protests that awarding the Belle Isle Project was "outside the boundaries of Mr. Kilpatrick's power."The protest is futile because the federal court order explicitly allows the Special Administrator to award the contract. EBI also complains that Kilpatrick never responded in writing to EBI's protest letter and that Kilpatrick never sought approval from the Detroit City Council when he short-circuited the bidding procedures. These complaints are irrelevant because nothing in the order appointing Kilpatrick Special Administrator requires him to seek the City Council's approval when awarding contracts, *cf. United States v. City of Detroit,* 2000 WL 371795 at *2 (stating that Special Administrator may exercise "all functions and powers of the Detroit City Council"), or to respond personally to every protest letter. Indeed, it is worth noting that if the Special Administrator is authorized to waive competitive bidding altogether, he is certainly authorized to waive EBI's right to appeal the denial of its bid to DWSD's Board.

### IV

*12 EBI raises, for the first time on appeal, an argument that Judge Feikens should have recused himself from hearing this case. We have little difficulty rejecting this contention. EBI bases its

argument on 28 U.S.C. § 455, which states that:

(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

...

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) Is a party to the proceeding, or an officer, director, or trustee of a party.

28 U.S.C. § 455. EBI points to Judge Feikens's longstanding role in overseeing the consent decree between DWSD and the EPA. It claims that Judge Feikens is the "de facto chief executive officer" of DWSD, and therefore he should have disqualified himself under § 455(a) because his objectivity could be reasonably questioned, and under § 455(b)(5)(i) because he is an "officer" or "director" of DWSD. But EBI offers no specific facts that would evidence bias by Judge Feikens (other than his decision against EBI) and no case suggesting that Judge Feikens should have recused himself.

[9] We have held that "[i]n order to justify recusal under 28 U.S.C. § 455, the judge's prejudice or bias must be *personal* or *extrajudicial."United States v. Jamison,* 427 F.3d 394, 405 (6th Cir.2005) (emphasis added). Here, Judge Feikens's knowledge of, and relationship with, DWSD arose solely from his judicial role in overseeing the consent decree. A judge's role in overseeing a consent decree is part of his judicial responsibilities and is not evidence of "personal" or "extrajudicial" bias. *Reed v. Rhodes,* 179 F.3d 453, 468 (6th Cir.1999). We therefore reject EBI's argument.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                    Page 12
Slip Copy, 2008 WL 2130472 (C.A.6 (Mich.))
**(Not Selected for publication in the Federal Reporter)**

V

By alleging that Kilpatrick exceeded the powers granted to him as Special Administrator, EBI pleaded itself into federal court. *Cf. NicSand, 507 F.3d at 458.* This gives our court jurisdiction, and while we cannot say whether the defendants' actions were fair or wise, we hold that they were not illegal and therefore AFFIRM the judgment of the district court.

FN* The Honorable Milton I. Shadur, United States District Judge for the Northern District of Illinois, sitting by designation.

FN1. "Bid equalization" is a process that allows a government body to give preference to bidders with certain characteristics by adjusting the bidder's bid according to an equalization table. DWSD gives bidders an "equalization allowance" of between 1% and 5%, depending on the contract size, to Detroit-based businesses or to small businesses. *See Walsh Constr. Co. of Ill. v. City of Detroit, 257 F.Supp.2d 935, 938 (E.D.Mich.2003)* (discussing Detroit's equalization process).

FN2. For additional illustrations of when a state official can invoke federal officer jurisdiction under § 1442(a), compare *Tucker v. Cleveland Bd. of Educ., 465 F.Supp. 687, 689 (N.D.Ohio 1979)* (no federal officer jurisdiction because defendants "undertook these actions of [their] own volition, albeit as a response to this Court's orders") with *Voinovich v. Cleveland Bd. of Educ., 539 F.Supp. 1100, 1102 (N.D.Ohio 1982)* (federal officer jurisdiction because the court had "directly ordered" the Board's actions as part of desegregation consent decree).

FN3. EBI relies on *Global Satellite Commc'n Co. v. Starmill U.K. Ltd.,. 378 F.3d 1269 (11th Cir.2004)* and *Fluidtech, Inc. v. Gemu Valves, Inc.,* 457 F.Supp.2d 763 (E.D.Mich.2006), but neither case is persuasive.*Global Satellite* is not persuasive because that court held that waiver of the right to remove need not be unequivocal and clear, but nevertheless held that a clause

stating that the parties agreed to "submit to the jurisdiction of Broward County, Florida," did not waive the defendant's right to remove the case. *Global Satellite, 378 F.3d at 1271-72.Fluidtech* is even less on point because it dealt with venue and never mentioned removal. A more relevant case is *City of New Orleans v. Mun. Admin. Servs., Inc., 376 F.3d 501 (5th Cir.2004),* which held that a clause similar to the one here was not a clear waiver of the right to remove.*Id. at 505.*

FN4. Our cases generally call a bidder who sues after having his bid rejected by the government a "disappointed bidder" regardless of the basis on which the government rejected the bid. *See, e.g., Club Italia, 470 F.3d at 293.* Other courts occasionally call the bidder in these situations a "disqualified" or "unsuccessful" bidder. *See, e.g., In re Colony Hill Associates, 111 F.3d 269, 273 (2d Cir.1997).* We will refer to EBI as a "disappointed" bidder to help maintain the distinction between the usual case, where the bidder has no standing and merely sees his immediate bid rejected for whatever reason, and the unusual case where the bidder may have standing because it has been disqualified from bidding on future projects. *Cf. Club Italia, 470 F.3d at 293* (no standing for "disappointed" bidder whose bid was rejected) and *Colony Hill,* 111 F.3d at (stating that "unsuccessful" or "disqualified" bidders do not have standing, but holding that standing existed under the Bankruptcy Code) with *United of Omaha Life Ins. Co. v. Solomon, 960 F.2d 31, 34 (6th Cir.1992)* (per curiam) (bidder disqualified from bidding on future contracts may have standing).

FN5. We note, as additional reasons for our understanding of Michigan law, that the cases which disagree over *Smith* deal with the immunity of lower-level government employees and that the Michigan Supreme Court's grant of leave to appeal in *Odom* asked whether "intentional torts claims be brought under MCL 691.1407(2)," which

Slip Copy, 2008 WL 2130472 (C.A.6 (Mich.))
**(Not Selected for publication in the Federal Reporter)**

grants qualified immunity, and not <u>Mich.
Comp. Laws 691.1407</u>(5), which applies to
Mercado and Kilpatrick. <u>*Odom*, 480 Mich.
1184, 747 N.W.2d 249, 2008 WL 1851282,
at  *1</u>. If we are wrong, we welcome
correction by the Michigan Supreme Court
in *Odom* and add that the outcome of this
case would not change because, as we
explain later, EBI's claims lack merit.

C.A.6 (Mich.),2008.
EBI-Detroit, Inc. v. City of Detroit
Slip Copy, 2008 WL 2130472 (C.A.6 (Mich.))

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy
Slip Copy, 2008 WL 2856475 (S.D.N.Y.)

Page 1

L & L Painting Co., Inc. v. Odyssey Contracting
Corp.
S.D.N.Y.,2008.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
L & L PAINTING CO., INC., Plaintiff,
v.
ODYSSEY CONTRACTING CORP., Defendant.
No. 08 Civ. 3559(SAS).

July 22, 2008.

Charles Fastenberg, Esq., Thelen Reid Brown
Raysman & Steiner LLP, New York, NY, for
Plaintiff.
Michael McDermott, Esq., Georgoulis & Associates,
PLLC, New York, NY, for Defendant.

***MEMORANDUM OPINION AND ORDER***

SHIRA A. SCHEINDLIN, District Judge.

I. INTRODUCTION

*1 Plaintiff moves to remand this action to the
Supreme Court of the State of New York. The motion
to remand is based on a provision in the parties'
contract, out of which this action arises, that waives
the defendant's right to remove the instant action to
federal court. For the reasons that follow, the motion
is granted.

II. BACKGROUND

In 2003, L & L Painting Co., Inc. ("L & L" or the
"Contractor") entered into a prime contract (the
"Prime Contract") with the City of New York (the
"City") to repaint the Queensboro Bridge (the
"Project").[FN1] In March 2004, L & L entered into a
subcontract with Odyssey Contracting Corp.
("Odyssey" or the "Subcontractor") wherein Odyssey
agreed to perform certain specified work on the
Project.[FN2] On April 9, 2008, L & L commenced the
instant action against Odyssey in the New York State
Supreme Court alleging that Odyssey breached the
subcontract by terminating and abandoning its
work.[FN3] On April 10, 2008, Odyssey commenced a

separate action against L & L in this Court (the
"Second Action") alleging that L & L breached the
parties' subcontract.[FN4] On April 14, 2008, Odyssey
removed the state court action to this Court, asserting
jurisdiction based on diversity of citizenship.[FN5]
Odyssey is a Pennsylvania corporation, and L & L is
a New York corporation. The amount in controversy
is $3,000,000.[FN6]

FN1.See Plaintiff's Memorandum of Law in
Support of Motion ("Pl.Mem.") at 1.

FN2.See id.

FN3.See id.

FN4. Odyssey's claims arise out of the same
"transaction or occurrence" as the instant
case, and therefore are compulsory
counterclaims. Fed.R.Civ.P. 13(a) ("A
pleading must state as a counterclaim any
claim that ... arises out of the transaction or
occurrence that is the subject matter of the
opposing party's claim ....").

FN5.See id. at 1-2 (citing 28 U.S.C. § 1332).

FN6.See id.

L & L seeks to remand this action on the ground that
Odyssey waived its right of removal by the express
terms of article 26(b) of the subcontract which
provides:

With respect to any action between the Contractor
and the Subcontractor in New York State Court,
that is not subject to the Prime Contract, the
Subcontractor hereby expressly waives and
relinquishes any rights it might otherwise have (i)
to move to dismiss on grounds of forum non
conveniens, (ii) to remove to Federal Court, and
(iii) to move for a change of venue to a New York
State Court outside New York County.[FN7]

FN7.Id.

Slip Copy                                                                    Page 2
Slip Copy, 2008 WL 2856475 (S.D.N.Y.)

The phrase "not subject to the Prime Contract" refers to actions that are not subject to the mandatory dispute resolution procedure set forth in article 27 of the Prime Contract which incorporates section 4-09 of the New York City Procurement Policy Board Rules.[FN8] Under this procedure, claims against the City for "extra work" or "out of scope" work are to be resolved "exclusively" through various administrative reviews including, among others, review by the City's Contract Dispute Resolution Board ("CDRB").[FN9] L & L maintains that the instant action is not subject to the Prime Contract and is therefore governed by the waiver of removal clause of the subcontract.

FN8. *See id.* at 4.

FN9. *Id.*

## III. LEGAL STANDARD

### A. Remand

Section 1447(c) of title 28 of the United States Code provides: "A motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal ...." When a party challenges the removal of an action from state court, the burden falls on the removing party "to establish its right to a federal forum by 'competent proof.' "[FN10] "In light of the congressional intent to restrict federal court jurisdiction, as well as the importance of preserving the independence of state governments, federal courts construe the removal statute narrowly, resolving any doubts against removability."[FN11] If the removing party cannot establish its right to removal by competent proof, the removal is improper, and the district court must remand the case to the court in which it was filed.[FN12]

FN10. *R.G. Barry Corp. v. Mushroom Makers, Inc.,* 612 F.2d 651, 655 (2d Cir.1979) (quoting *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189 (1936)).

FN11. *Somlyo v. J. Lu-Rob Enters., Inc.,* 932 F.2d 1043, 1046 (2d Cir.1991) (citing *Shamrock Oil & Gas Corp. v. Sheets,* 313

U.S. 100, 108 (1941)). *Accord Syngenta Crop Prot., Inc. v. Henson,* 537 U.S. 28, 31 (2002) (noting that "statutory procedures for removal are to be strictly construed").

FN12. *See United Food & Commercial Workers Union, Local 919 v. Centermark Props. Meriden Square,* 30 F.3d 298, 301 (2d Cir.1994) (citing *R.G. Barry Corp.,* 612 F.2d at 655). *See also Klein v. Vision Lab Telecomms., Inc.,* 399 F.Supp.2d 528, 531 (S.D.N.Y.2005); *Kings Choice Neckwear, Inc. v. DHL Airways, Inc.,* No. 02 Civ. 9580, 2003 WL 22283814, at *2 (S.D.N.Y. Oct. 2, 2003).

### B. Forum-Selection Clause

**\*2** "Although courts once frowned upon enforcement of forum-selection clauses, it is now settled law that parties may bargain in advance to select the forum in which their disputes will be adjudicated."[FN13] Any remaining hostility toward forum-selection clauses is "simply a vestigial remainder of an outmoded doctrine."[FN14] As stated by the Supreme Court, forum-selection clauses "are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances."[FN15] Thus, "[f]orum selection clauses are presumptively enforceable,"[FN16] unless it clearly can be shown that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching."[FN17]

FN13. *Design Strategy Corp. v. Nghiem,* 14 F.Supp.2d 298, 300 (S.D.N.Y.1998) (citing *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 13 (1972) and *Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 590-96 (1991)).

FN14. *Bense v. Interstate Battery Sys. of Am.,* 683 F.2d 718, 721 (2d Cir.1982).

FN15. *M/S Bremen,* 407 U.S. at 10. *Accord Phillips v. Audio Active, Ltd.,* 494 F.3d 378, 384 (2d Cir.2007).

FN16. *J.B. Harris, Inc. v. Razei Bar Indus.,*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                    Page 3
Slip Copy, 2008 WL 2856475 (S.D.N.Y.)

37 F.Supp.2d 186, 189 (E.D.N.Y.1998), *aff'd*,181 F.3d 82 (2d Cir.1999).

FN17.*Karl Koch Erecting Co. v. New York Convention Ctr. Dev. Corp .,* 838 F.2d 656, 659 (2d Cir.1988) (quotation marks and citations omitted).*Accord District No. 1-Pacific Coast Dist. v. Trinidad Corp.,* 583 F.Supp. 262, 263-65 (S.D.N.Y.1984).

## IV. DISCUSSION

In its motion to remand, L & L asserts that Odyssey expressly waived its right to remove an action of this nature to federal court. Such forum-selection clauses are "prima facie valid," and should be enforced unless enforcement would be "unreasonable." [FN18]Here, the parties knowingly entered into the subcontract, which included a clear waiver of removal, and Odyssey has made no showing of fraud, overreaching, unreasonableness, or unfairness.[FN19]The contractual waiver was agreed to and signed by both the parties and is presumptively enforceable.[FN20]

FN18.*M/S Bremen,* 407 U.S. at 10.

FN19.*See District No. 1,* 583 F.Supp. at 263-65 (motion to remand granted when enforceable forum-selection clause explicitly barred removal).

FN20.*See Karl Koch,* 838 F.2d at 659-60 (mandatory forum-selection clause is enforceable).

However, a dispute between the Contractor and the Subcontractor that is subject to the Prime Contract is exempt from the terms of article 26(b). Defendant asserts that the instant action, as well as two claims in the Second Action, fall within this exemption because these claims are subject to the Prime Contract. Claims subject to the Prime Contract include disputes related to the scope of work set forth in that contract, the amounts payable for extra work or disputed work between the City and the Contractor, and the acceptability and quality of the Contractor's work.[FN21]

FN21.*See* Pl. Mem. at 6 (citing 10/1/00

Prime Contract at 26).

The claims asserted in both actions stem from the Subcontractor's alleged breach of the subcontract. In the removed action, L & L asserts that Odyssey terminated its subcontract work while such work was still in progress. These breach of contract claims are not subject to the Prime Contract.[FN22]In the Second Action initiated against L & L, Odyssey asserts that two of its claims are dependent upon proceedings that L & L has initiated against the City pursuant to the Prime Contract's dispute resolution provisions.[FN23]These claims relate to a 2005 fire which damaged the Project and an alleged misrepresentation of plans and designs for the south outer roadway.[FN24]To the extent that L & L succeeds in obtaining payment for these claims, Odyssey asserts that L & L will pay Odyssey this money, and Odyssey will reduce its claim against L & L accordingly.[FN25]L & L disputes this assertion, calling it "speculative and erroneous." [FN26]Even assuming *arguendo* that Odyssey's assertion is true, which is unlikely given that L & L's claim was denied by the CDRB,[FN27] Odyssey's constricted interpretation of claims excepted from the waiver clause does not establish that these claims are actually subject to the Prime Contract.

FN22. If the instant claims were subject to the Prime Contract, the action could only be pursued through administrative review by the designated New York agencies-CDRB, among others.

FN23.*See* Defendant's Memorandum of Law in Opposition of Motion ("Def.Mem.") at 2.

FN24.*See id.* at 3.

FN25.*See id.*

FN26. Plaintiff's Reply Memorandum of Law at 3.

FN27.*See* Def. Mem. at 3.

*3 As noted, claims subject to the Prime Contract include disputes between the Contractor and the City for disputes related to the scope of work, the amounts payable for extra work or disputed work, and the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy

Slip Copy, 2008 WL 2856475 (S.D.N.Y.)

acceptability and quality of the Contractor's work.[FN28]Odyssey's claims, however, are not asserted against the City for such disputes. Odyssey's claims are asserted against L & L for breach of contract in connection with the 2005 fire and alleged misrepresentations concerning the south outer roadway. Accordingly, these claims are subject to the terms of article 26(b) of the subcontract, which prohibit removal to this Court. Because Odyssey has not established its right to removal by " 'competent proof,' " the removal is improper.[FN29]For the foregoing reasons, the motion to remand is granted.

> FN28.*See* Pl. Mem. at 6 (citing 10/1/00 Prime Contract at 26).

> FN29.*R.G. Barry Corp.*, 612 F.2d at 655 (quoting *McNutt*, 298 U.S. at 189).

## V. CONCLUSION

For the reasons discussed above, defendant's motion to remand is granted. The Clerk of the Court is directed to close these motions [nos. 8 on the docket sheet] and both cases.

SO ORDERED:

S.D.N.Y.,2008.
L&amp;L Painting Co., Inc. v. Odyssey Contracting Corp.
Slip Copy, 2008 WL 2856475 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d                                                        Page 1
Not Reported in F.Supp.2d, 2001 WL 1298718 (N.D.Ill.)

**C** Truserv Corp. v. Prices Ilfeld Hardware, Co., Inc.
N.D.Ill.,2001.
**No. 01 C 50271.**

Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
Oct. 24, 2001.

MEMORANDUM OPINION AND ORDER

REINHARD.
*1 On June 28, 2001, plaintiff Truserv Corporation
("Truserv") filed a two-count complaint against
defendant Prices Ilfeld Hardware Co., Inc. ("Ilfeld")
in the circuit court for the 19th Judicial Circuit,
McHenry County, Illinois, for breach of contract and
an accounting. On August 6, 2001, Ilfeld removed the
lawsuit to this court. Currently pending is Truserv's
motion to remand the action to state court. This court
has diversity jurisdiction pursuant to 28 U.S.C. §
1332.

In arguing that this matter should be remanded to
state court, Truserv relies on a forum selection clause
contained in a retail member agreement ("the
Agreement") executed between the parties. (Compl.,
Exh. A) The Agreement states: "This Agreement
shall be enforced against either [Ilfeld] or [Truserv],
only in courts located in Cook County or any Illinois
county contiguous to Cook County, Illinois, and only
be interpreted in accordance with the substantive
laws of Illinois without giving effect to its conflict of
laws principles."(Compl., Exh. A, p. 5)

Initially, the court notes neither party has directly
addressed the issue of whether Illinois state law or
federal common law governs the issue of the validity
of the forum selection clause. *Compare Roberts &
Schaefer Co. v. Merit Contracting, Inc.,* 99 F.3d 248,
251 (7th Cir.1996) (applying Illinois law to issue
regarding validity of forum selection clause because
parties designated Illinois law), *cert. denied,* 520 U.S.
1167 (1997)*with Northwestern Nat'l Ins. Co. v.
Donovan,* 916 F.2d 372, 374 (7th Cir.1990) (applying
federal common law because litigants so designated).
The court will apply federal common law because

that appears to be the more correct approach, *see
Donovan,* 916 F.3d at 373 (applying federal common
law is probably the correct approach), and because
the parties apparently assume federal law applies,
having cited federal cases in their arguments.

Truserv argues the forum selection clause applies
only to Illinois state courts, not federal courts.
(Reply, p. 1-2) The court disagrees. A forum
selection clause is to be treated like any other
contractual provision.*Donovan,* 916 F.2d at 375.
Thus, it is enforceable unless there is a strong
showing that it should be set aside. *Heller Fin., Inc.
v. Midwhey Powder Co., Inc.,* 883 F.2d 1286, 1290-
91 (7th Cir.1989). Courts are split as to whether a
forum selection clause's reference to a county,
without more, includes federal as well as state courts.
*Compare Regis Assoc. v. Rank Hotels (Mgmt) Ltd.,*
894 F.2d 193, 195-96 (6th Cir.1990) (clause stating
that "parties "hereby submit to the jurisdiction of the
Michigan Courts" held to include federal district
courts in Michigan); *Links Design, Inc. v. Lahr,* 731
F.Supp. 1535, 1536 (M.D.Fla.1990) (clause stating
that the proper venue for any legal action in
connection with agreement "shall be Polk County,
Florida" held to include federal district court for the
district including Polk County); *International Ass'n
of Bridge, Structural and Ornamental Iron Workers
v. Koski Constr. Co.,* 474 F.Supp. 370, 371-72
(W.D.Pa.1979) (clause stating that proper venue for
any action for violations of the agreement "shall be in
Erie County, Pennsylvania" held to include federal
district court for the Western District of
Pennsylvania) *with Excell, Inc. v. Sterling Boiler &
Mech., Inc.,* 106 F.3d 318, 321 (10th Cir.1997)
(clause referring only to county and not to "judicial
districts" held to refer only to state courts, not federal
courts); *Milk 'N' More, Inc. v. Beavert,* 963 F.2d
1342, 1345-46 (10th Cir.1992) (clause stating that
"venue shall be proper under this agreement in
Johnson County, Kansas" held to refer only to the
state court in that county); *Intermountain Sys., Inc. v.
Edsall Constr. Co.,* 575 F.Supp. 1195, 1198
(D.Colo.1983) (phrase, "venue shall be in Adams
County, Colorado" held to refer only to state court in
that county).

*2 The statement, "[t]his Agreement shall be

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1298718 (N.D.Ill.)

enforced against either [Ilfeld] or [Truserv], only in courts located in Cook county or any Illinois county contiguous to Cook County, Illinois," is subject to two reasonable interpretations: (1) the clause includes any federal district court for the districts including Cook County or any Illinois county contiguous to Cook County; or (2) the clause includes only state courts located in Cook County or Illinois counties contiguous to Cook County, Illinois. *See Links,* 731 F.Supp. at 1536. The agreement is a standard form agreement drafted by Truserv. Had Truserv wanted to preclude its members from being able to sue in federal court, it should have stated so more clearly. Ambiguities are construed against the drafter, and the court finds the forum selection clause at issue includes state and federal courts. *See id.;Newman/Haas Racing v. Unelko Corp.,* 813 F.Supp. 1345, 1348 n. 3 (N.D.Ill.1993).

Truserv also argues that even if the clause in question includes federal courts, it does not include this division. Truserv argues this court sits in Rockford, located in Winnebago County, Illinois, which is not contiguous to Cook County. "Locate" is defined as, "to determine or indicate the place, site, or limits of."WEBSTER'S NEW COLLEGIATE DICTIONARY669 (1979). This division's limits extend to and include McHenry County, which is contiguous to Cook County. Thus, this division falls within the ambit of the forum selection clause. Truserv's motion to remand is denied.

N.D.Ill.,2001.
Truserv Corp. v. Prices Ilfeld Hardware, Co., Inc.
Not Reported in F.Supp.2d, 2001 WL 1298718 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy                                                                 Page 1
Slip Copy, 2007 WL 3231423 (S.D.Ill.)

**H**Kurz v. Fidelity Management & Research Co.
S.D.Ill.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. Illinois.
David **KURZ** and Raymond Heinzl, on behalf of
themselves and all others similarly situated,
Plaintiffs,
v.
FIDELITY MANAGEMENT & RESEARCH
COMPANY and FMR Co., Inc., Defendants.
**No. 07-cv-709-JPG.**

Oct. 30, 2007.

Steven A. Katz, Korein Tillery, LLC, St. Louis, MO,
for Plaintiffs.
Rebecca R. Jackson, Bryan Cave, St. Louis, MO, for
Defendants.

### *MEMORANDUM AND ORDER*

GILBERT, District Judge.
*1 This matter is before the Court on preliminary
review of the allegations of federal subject matter
jurisdiction contained in the notice of removal filed
by the defendants Fidelity Management & Research
Company ("Fidelity") and FMR Co., Inc.
("FMR").*See Cox v. Strauch,* Civil No. 07-680-GPM,
2007 WL 2915593, at *1 (S.D.Ill. Oct. 5, 2007)
(reviewing sua sponte the allegations of federal
subject matter jurisdiction contained in a defendant's
notice of removal); *Board of Educ. of Decatur Sch.
Dist. No. 61 v. Rainbow/Push Coal.,* 75 F.Supp.2d
916, 918 (C.D.Ill.1999) (citing *Wisconsin Knife
Works v. National Metal Crafters,* 781 F.2d 1280,
1282 (7th Cir.1986)) (same); *Waymar Med., Inc. v.
American Med. Elecs., Inc.,* 786 F.Supp. 754, 755
(E.D.Wis.1992) (same). For the following reasons,
the plaintiffs David Kurz and Raymond Heinzl are
hereby **ORDERED TO SHOW CAUSE** why this
action should not be dismissed pursuant to the
Securities Litigation Uniform Standards Act of 1998
("SLUSA"), Pub.L. 105-353, 112 Stat. 3227
(codified at 15 U.S.C. § 77p(b)-(f) and 15 U.S.C. §
78bb(f)).

### *I. Background*

This action is the successor to *Kurz v. Fidelity
Management & Research Co.,* Civil No. 07-592-JPG
(S.D. Ill. filed Aug. 17, 2007), in which Kurz alleged
federal subject matter jurisdiction on the basis of 28
U.S.C. § 1332, as amended by the Class Action
Fairness Act of 2005 ("CAFA"), Pub.L. No. 109-2,
119 Stat. 4 (codified in scattered sections of 28
U.S.C.).*See Kurz v. Fidelity Mgmt. & Research Co.,*
No. 07-cv-592-JPG, 2007 WL 2746612, at *2
(S.D.Ill. Sept. 18, 2007); *Kurz v. Fidelity Mgmt. &
Research Co.,* No. 07-cv-592-JPG, 2007 WL
2746612, at *1 (S.D.Ill. Sept. 18, 2007). Thereafter,
the Court ordered Kurz to show cause why this action
should not be dismissed for lack of federal subject
matter jurisdiction pursuant to 28 U.S.C. §
1332(d)(9)(A) and (C), the so-called "securities
exception" to federal diversity jurisdiction under
CAFA. *See Kurz,* 2007 WL 2746612, at * *2-4. See
also Davis v. Chase Bank U.S.A., N.A.,* 453
F.Supp.2d 1205, 1207-08 (C.D.Cal.2006). The Court
further directed Kurz to show cause whether, if
federal subject matter jurisdiction did not exist in
Case No. 07-592 under CAFA, such jurisdiction
nonetheless was proper pursuant to SLUSA. *See
Kurz,* 2007 WL 2746612, at *4. Kurz then voluntarily
dismissed Case No. 07-592 by notice pursuant to
Rule 41(a)(1)(i) of the Federal Rules of Civil
Procedure. *See Kurz v. Fidelity Mgmt. & Research
Co.,* No. 07-CV-592-JPG, 2007 WL 2908918
(S.D.Ill. Oct. 4, 2007).

Following the voluntary dismissal of Case No. 07-
592, Kurz refiled his claims in the Circuit Court of
the Twentieth Judicial Circuit, St. Clair County,
Illinois, joining Heinzl as a party plaintiff. The case
was timely removed from state court to this Court,
with federal subject matter jurisdiction asserted on
the basis of 28 U.S.C. § 1331, including SLUSA.
After removal, this case was assigned initially to
United States District Judge G. Patrick Murphy.
However, in conformity with the Court's policy that
related cases-in this instance, Case No. 07-592 and
this case-should be concentrated before the same
judge, *see Vogel v. Merck & Co.,* 476 F.Supp.2d 996,
998 (S.D.Ill.2007), the case subsequently was
reassigned to the undersigned United States District
Judge for all further proceedings.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 3231423 (S.D.Ill.)

Page 2

**\*2** The gravamen of the claims asserted by Kurz and Heinzl has been outlined by the Court in a previous order in Case No. 07-592, *see Kurz, 2007 WL 2746612, at \* \*1-2*, but bears some repeating here. Kurz and Heinzl allege that they are former investors in investment portfolios managed by Fidelity and FMR, who are alleged to be registered investment advisers or affiliated persons of such advisers. *See* 15 U.S.C. § 80b-2(a)(11), (a)(12); 15 U.S.C. § 80b-3. Kurz and Heinzl allege that Fidelity and FMR entered into confirmation agreements with securities brokers executing portfolio transactions directed by the defendants, and that an implied term of those agreements were rules of the National Association of Securities Dealers ("NASD") and the New York Stock Exchange ("NYSE") requiring investment advisers to obtain "best execution" for their customers in executing portfolio transactions for those customers. This duty of best execution, according to the complaint, "required Fidelity and FMR to choose brokers on the basis of the most favorable practicable execution costs, taking into consideration the size of each transaction, the number of transactions per year, the market impact of the transaction, brokerage commissions, services provided by the broker, and other considerations." Complaint ¶ 10. Kurz and Heinzl allege that the agreements imposed on Fidelity and FMR a contractual duty of best execution enforceable by the defendants' customers.

Kurz and Heinzl allege that Fidelity and FMR breached their contractual duty by retaining Jeffries & Co. ("Jeffries") to execute portfolio transactions for the defendants' customers in return for lavish gifts to the defendants' traders from Jeffries. According to the complaint, as redress for this breach of the duty of best execution, the chairman of Fidelity's board of trustees E.C. Johnson, III, agreed to pay $42 million plus interest to Fidelity's family of mutual funds. Kurz and Heinzl assert claims for breach of contract against Fidelity and FMR based on the defendants' alleged violations of their duty of best execution as contained in the agreements. The plaintiffs seek to represent a class of persons who were clients of Fidelity and FMR from May 1, 2002, until October 31, 2004, and who liquidated their investments and/or terminated their management agreements with the defendants before December 21, 2006, and whose investment portfolios included at least one

transaction in which the defendants used Jeffries as the executing broker.

## II. *Discussion*

### A. Federal Question Jurisdiction

Under 28 U.S.C. § 1441, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). In general, of course, federal courts have "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. As noted, the asserted basis for federal subject matter jurisdiction in this case is Section 1331. The usual test of whether an action arises under federal law for purposes of so-called "federal question" jurisdiction pursuant to Section 1331 is the "well-pleaded complaint" rule, which provides generally that a case arises under federal law within the meaning of the statute only when federal law appears on the face of a plaintiff's complaint. *See Caterpillar Inc. v. Williams, 482 U.S. 386, 392 (1987); Louisville & Nashville R.R. Co. v. Mottley, 211 U.S. 149, 152-53 (1908); Rice v. Panchal, 65 F.3d 637, 639 (7th Cir.1995).* As Justice Holmes explained, "A suit arises under the law that creates the cause of action." *American Well Works Co. v. Layne & Bowler Co., 241 U.S. 257, 260 (1916). See also In re Application of County Collector of Winnebago County, Ill., 96 F.3d 890, 895 (7th Cir.1996); Clevenger v. Eastman Chem. Co.,* No. 07-cv-148-DRH, 2007 WL 2458474, at \*2 (S.D.Ill. Aug. 24, 2007); *Kuntz v. Illinois Cent. R.R. Co.,* 469 F.Supp.2d 586, 589 (S.D.Ill.2007). In this instance, as discussed, Kurz and Heinzl allege only state-law claims for breach of contract. However, that is not quite the end of the matter, in light of certain recognized exceptions to the well-pleaded complaint rule, specifically, the doctrine of a "substantial federal question" and the doctrine of "complete preemption," both of which are discussed *infra.*

### 1. Substantial Federal Question

**\*3** The substantial federal question doctrine provides generally that "[e]ven though state law creates [a plaintiff's] cause of action, [the] case still might 'arise

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy

Slip Copy, 2007 WL 3231423 (S.D.Ill.)

under' the laws of the United States if a well-pleaded complaint established that its right to relief under state law requires resolution of a substantial question of federal law in dispute between the parties." *Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Trust for S. Cal.,* 463 U .S. 1, 13 (1983). *See also Gully v. First Nat'l Bank,* 299 U.S. 109, 112-13 (1936); *Smith v. Kansas City Title & Trust Co.,* 255 U.S. 180, 195-99 (1921); *International Armor & Limousine Co. v. Moloney Coachbuilders, Inc.,* 272 F.3d 912, 915 (7th Cir.2001); *Kuntz,* 469 F.Supp.2d at 594-95. In this instance Fidelity and FMR argue that this case presents a substantial question of federal law because the duty of best execution they are alleged to have breached is a creature of federal law, and because resolution of this case necessarily will entail the construction of federal securities laws and regulations promulgated thereunder. However, the Court is not persuaded that this case comes within the scope of the substantial federal question doctrine for purposes of removal to federal court.

The duty of best execution, although extensively codified in federal law governing securities, originates in familiar common-law principles of agency. In *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 135 F.3d 266 (3d Cir.1998), the court explained:

The duty of best execution, which predates the federal securities laws, has its roots in the common law agency obligations of undivided loyalty and reasonable care that an agent owes to his principal.... Since it is understood by all that the client-principal seeks his own economic gain and the purpose of the agency is to help the client-principal achieve that objective, the broker-dealer, absent instructions to the contrary, is expected to use reasonable efforts to maximize the economic benefit to the client in each transaction.

The duty of best execution thus requires that a broker-dealer seek to obtain for its customer orders the most favorable terms reasonably available under the circumstances.

*Id.* at 270 (collecting cases). *See also Zannini v. Ameritrade Holding Corp.,* 667 N.W.2d 222, 230-31 (Neb.2003) (reversing a grant of summary judgment as to a claim that a broker violated its duty of best

execution under state law); Restatement of Agency (Second) § 424 (1958) (stating that an agent must "use reasonable care to obtain terms which best satisfy the manifested purposes of the principal."); Francis J. Facciolo, *A Broker's Duty of Best Execution in the Nineteenth and Early Twentieth Centuries,* 26 Pace L.Rev. 155 (2005) (tracing the best execution obligation back to state law). As the Securities and Exchange Commission ("SEC") has recognized, the "duty of best execution derives from common law agency principles and fiduciary obligations, and is incorporated both in [self-regulating organization] rules and, through judicial and [SEC] decisions, in the antifraud provisions of the federal securities laws." *Order Execution Obligations,* Exchange Act Release No. 34-37619, 62 SEC Docket 1795, 1996 WL 493303, at *51 (Aug. 29, 1996). Thus, it is not the case that, as Fidelity and FMR assert in their notice of removal, a claim based on an agent's duty of best execution necessarily arises under federal law.

*4 To the extent that federal law forms an element of the state-law claims asserted by Kurz and Heinzl, it is well settled that a claim for a violation of state law based upon a breach of a duty created by federal law does not present a substantial federal question for purposes of federal question jurisdiction. As the Supreme Court of the United States admonished recently, "[a] general rule of exercising federal jurisdiction over state claims resting on federal mislabeling and other statutory violations would ... herald [ ] a potentially enormous shift of traditionally state cases into federal courts." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.,* 545 U.S. 308, 319 (2005) (citing *Merrell Dow Pharms. Inc. v. Thompson,* 478 U.S. 804, 811-12 (1986)). Accordingly, federal courts must be cautious in entertaining "state claims with embedded federal issues" lest they "materially affect, or threaten to affect, the normal currents of litigation" as between federal and state courts. *Id.* at 318, 319. *See also Bennett v. Southwest Airlines Co.,* 484 F.3d 907, 908-12 (7th Cir.2007) (holding that state-law negligence claims did not present a substantial federal question, although some of the applicable standards of care were furnished by regulations promulgated by the Federal Aviation Administration); *Vivas v. Boeing Co.,* 486 F.Supp.2d 726, 729-32 (N.D.Ill.2007) (holding that products liability and negligence claims arising out of an airplane crash during a landing approach were not removable on the basis of federal

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                   Page 4
Slip Copy, 2007 WL 3231423 (S.D.Ill.)

question jurisdiction, notwithstanding the fact that federal law and regulations concerning airplane safety set the standard of care for the state-law claims); *Fuller v. BNSF Ry. Co.,* 472 F.Supp.2d 1088, 1095 (S.D.Ill.2007) (allegations of negligence based upon a defendant's violation of federal railroad safety regulations did not present a substantial federal question: "[A] plaintiff's invocation of federal law as the source of a duty under state law is simply insufficient to create federal question jurisdiction."). In this instance, assuming that federal law constitutes an element of the state-law claims for breach of contract alleged by Kurz and Heinzl, this does not mean that this case presents a substantial federal question so as to arise under federal law for purposes of removal to federal court.

## 2. Complete Preemption

Far more pertinent to this case than the substantial federal question doctrine is the doctrine of complete preemption. Complete preemption occurs when "the preemptive force of a [federal] statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.' " *Nelson v. Stewart,* 422 F.3d 463, 466-67 (7th Cir.2005) (quoting *Caterpillar,* 482 U.S. at 393). "Once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law." *Id.* at 467."In such situations, the federal statute ... not only preempt[s] state law but also authorize[s] removal of actions that sought relief only under state law." *Id.* The complete preemption doctrine brings the Court squarely to the issue of the applicability of SLUSA to this case, inasmuch as the statute, as will be discussed in more detail presently, completely preempts state-law class actions as to certain kinds of claims involving securities, making federal law the exclusive remedy for such claims and authorizing a federal forum for those claims through removal. "SLUSA was intended to completely preempt the field of certain types of securities class actions by essentially converting a state law claim into a federal claim and creating federal jurisdiction and venue for specified types of state securities fraud claims." *Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 332 F.3d 116, 123 (2d Cir.2003) (emphasis omitted).*See also Schnorr v. Schubert, No.*

CIV-05-303-M, 2005 WL 2019878, at *3 (W.D.Okla. Aug. 18, 2005); *Kingdom 5-KR-41, Ltd. v. Star Cruises PLC.,* No. 01 Civ. 2946(DLC), 01 Civ. 7670(DLC), 2004 WL 444554, at * *2-3 (S.D.N.Y. Mar. 10, 2004). In other words, when SLUSA applies to a state-law class action regarding securities, "no room remains for any state regulation and the complaint [is] 'necessarily federal in character' " for purposes of federal question jurisdiction. *Rogers v. Tyson Foods, Inc.,* 308 F.3d 785, 787 (7th Cir.2002) (quoting *Bastien v. AT & T Wireless Servs ., Inc.,* 205 F.3d 983, 986 (7th Cir.2000)).

*5 SLUSA amended the Securities Act of 1933 and the Securities Exchange Act of 1934 to preclude the maintenance of certain state-law claims regarding securities as class actions, and to provide for the removal to federal court of class actions asserting those claims. Specifically, SLUSA amended the 1933 Act to provide, in pertinent part:

No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging—

(1) an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security; or

(2) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

* * * *

Any covered class action brought in any State court involving a covered security ... shall be removable to the Federal district court for the district in which the action is pending[.]

15 U.S.C. § 77p(b), (c). The same provisions were added to the 1934 Act. *See*15 U.S.C. § 78bb(f)(1)-(2).[FN1] Therefore, SLUSA only precludes a claim where four conditions are met: (1) the underlying suit is a "covered class action"; (2) the claim is based on state law; (3) the claim concerns a "covered security"; and (4) the plaintiff alleges "a misrepresentation or omission of material fact," or "a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                                      Page 5
Slip Copy, 2007 WL 3231423 (S.D.Ill.)

manipulative or deceptive device or contrivance, in connection with the purchase or sale of a covered security."*See Green v. Ameritrade,* 279 F.3d 590, 596 (8th Cir.2001); *Beckett v. Mellon Investor Servs., LLC,* No. C06-5245 FDB, 2006 WL 3249189, at *2 (W.D.Wash. Nov. 8, 2006); *Golub v. Hilb, Rogal & Hobbs Co.,* 379 F.Supp.2d 639, 642 (D.Del.2005); *Zoren v. Genesis Energy, L.P.,* 195 F.Supp.2d 598, 603 (D.Del.2002); *Prager v. Knight/Trimark Group, Inc.,* 124 F.Supp.2d 229, 231 (D.N.J.2000); *Haney v. Pacific Telesis Group,* No. CV00758AHMMANX, 2000 WL 33400194, at *19 (C.D.Cal. Sept. 19, 2000); *Hines v. ESC Strategic Funds, Inc.,* No. 3:99-0530, 1999 WL 1705503, at *3 (M.D.Tenn. Sept. 17, 1999).*See also Nekritz v. Canary Capital Partners, LLC,* No. Civ. 03-5081(DRD), 2004 WL 1462035, at *3 (D.N.J. Jan. 12, 2004); *Araujo v. John Hancock Life Ins. Co.,* 206 F.Supp.2d 377, 381 (E.D.N.Y.2002); *Simon v. Internet Wire, Inc.,* No. CV0013195CBM (RNBX), 2001 WL 688542, at *2 (C.D.Cal. Apr. 3, 2001).

> FN1. For the sake of simplicity, henceforth the Court, in citing SLUSA, will cite to the statutory amendments of the 1933 Act, which, as noted, are identical to the amendments made by SLUSA to the 1934 Act.

Here, as discussed, the claims asserted by Kurz and Heinzl arise under state law, and it appears that this is a covered class action, defined by SLUSA as follows:

(2) Covered class action-

(A) In general

The term "covered class action" means-

(i) any single lawsuit in which-

(I) damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominate over any questions affecting only individual persons or members; or

*6 (II) one or more named parties seek to recover

damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members; or

(ii) any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which-

(I) damages are sought on behalf of more than 50 persons; and

(II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose.

15 U.S.C. § 77p(f)(2). It appears also that the claims before the Court involve covered securities within the meaning of SLUSA. The statute provides, in pertinent part,
The term "covered security" means a security that satisfies the standards for a covered security specified in paragraph (1) or (2) of section 77r(b) of this title at the time during which it is alleged that the misrepresentation, omission, or manipulative or deceptive conduct occurred, except that such term shall not include any debt security that is exempt from registration under this subchapter pursuant to rules issued by the [SEC] under section 77d(2) of this title.

15 U.S.C. § 77p(f)(3). Covered securities for purposes of 15 U.S.C. § 77r(b) are defined as follows:
(b) Covered securities

For purposes of this section, the following are covered securities:

(1) Exclusive Federal registration of nationally traded securities

A security is a covered security if such security is-

(A) listed, or authorized for listing, on the New York Stock Exchange or the American Stock Exchange, or listed, or authorized for listing, on the National Market System of the Nasdaq Stock Market (or any successor to such entities);

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(B) listed, or authorized for listing, on a national securities exchange (or tier or segment thereof) that has listing standards that the [SEC] determines by rule (on its own initiative or on the basis of a petition) are substantially similar to the listing standards applicable to securities described in subparagraph (A); or

(C) is a security of the same issuer that is equal in seniority or that is a senior security to a security described in subparagraph (A) or (B).

(2) Exclusive Federal registration of investment companies

A security is a covered security if such security is a security issued by an investment company that is registered, or that has filed a registration statement, under the Investment Company Act of 1940 [15 U.S.C.A. § 80a-1 et seq.].

15 U.S.C. § 77r(b).

Turning then to the question of whether the claims alleged by Kurz and Heinzl involve a misrepresentation or omission of material fact or a manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security such as to bring them within the scope of SLUSA, it appears that they do. In analyzing SLUSA preclusion, of course, the Court is guided by the substance rather than the form of a claim. Thus, the fact that the plaintiffs' claims are couched as claims for breach of contract rather than for misrepresentation is not dispositive as to the question of whether those claims are precluded under SLUSA. "The issue of preemption [under SLUSA] ... hinges on the content of the allegations-not on the label affixed to the cause of action."*Miller v. Nationwide Life Ins. Co.,* 391 F.3d 698, 702 (5th Cir.2004).*See also Denton v. H & R Block Fin. Advisors, Inc.,* No. 01 C 4185, 2001 WL 1183292, at *3 (N.D.Ill. Oct. 4, 2001) (in evaluating SLUSA preclusion, the focus is on the substance of the claim and not the plaintiff's characterization of it); *Abada v. Charles Schwab & Co.,* 68 F.Supp.2d 1160, 1165-66 (S.D.Cal.1999) (same).

*7 In *Felton v. Morgan Stanley Dean Witter & Co.,*

429 F.Supp.2d 684 (S.D.N.Y.2006), the plaintiffs alleged that certain contracts with a securities broker required the broker to abide by the rules and customs of the NASD, NYSE, and other self-regulatory organizations. *See id. at 687.*The plaintiffs further claimed that the broker breached the contracts by failing to provide objective research and recommendations and instead providing self-serving, biased information. *See id. at 687-88.*Although the complaint alleged only a breach of contract claim, the court found that the complaint alleged misrepresentations or omissions of material fact in connection with purchases or sales of a covered security within the meaning of SLUSA. "I conclude without difficulty that Plaintiffs' claim is a securities fraud wolf dressed up in a breach of contract sheep's clothing. The gravamen of the Amended Complaint ... is that conflicts of interest were created ... which were undisclosed to Plaintiffs and the class members."*Id. at 693.*"While Morgan Stanley customers believed that they were paying for and receiving informed and objective investment advice, they actually received recommendations based on Morgan Stanley's existing or desired investment banking deals.... Plaintiffs describe this conduct as a breach by Morgan Stanley ... of the standardized contracts with the Plaintiffs and Class members, ... and so it may have been, but it is also a quintessential example of a fraudulent omission of a material fact under the federal securities laws."*Id.* Thus, the court held that the claims were precluded by SLUSA. *See id.*

In *Rabin v. JPMorgan Chase Bank, N.A.,* No. 06 C 5452, 2007 WL 2295795 (N.D.Ill. Aug. 3, 2007), the plaintiffs, who were beneficiaries of a trust maintained by the defendant, alleged that the defendant breached fiduciary duties to trust beneficiaries by unilaterally investing fiduciary account assets into its proprietary mutual fund without regard to whether such investments were in the best interests of the beneficiaries. *See id.* at * 1. The plaintiffs further contended that the defendant generated undue profits by charging excessive fees. *See id.*The plaintiffs maintained that their class action claims for breach of fiduciary duty and unjust enrichment were "merely ancillary to and not predicated upon" material misrepresentations and omissions. *Id.* at *6. The court rejected that argument, reasoning that attempts to disguise securities fraud claims as claims for breach of fiduciary duty are "not enough to evade preclusion of

those claims under SLUSA."*Id.* (quoting *Potter v. Janus Inv. Fund,* 483 F.Supp.2d 692, 702 (S.D.Ill.2007)). Thus, the court analyzed the substance of the allegations and found that misrepresentations and omissions of material facts relating to the purchase of mutual fund shares were "the heart of the Amended Complaint," thereby triggering preclusion of the class claims under SLUSA. *Id.*

**\*8** In *Dommert v. Raymond James Financial Services, Inc.,* No. CIV A. 1:06-CV-102, 2007 WL 1018234 (E.D.Tex. Mar. 29, 2007), the plaintiff alleged that the defendants breached an investment management service agreement and their fiduciary duties by failing to act in the plaintiff's best interest and by failing to disclose material information about fees assessed against her. *See id.* at \* 2-3.Examining the allegations of the complaint as a whole, the court noted that the complaint made "specific references to omissions and failures to disclose" and ruled that the claims were "clearly based upon alleged fraudulent omissions."*Id.* at \* 7-8.The court explained further that "[t]he core basis" of the plaintiff's claims was that the defendants "failed to disclose important information ..., including material details about fees and financial gain retained by [the defendants] ..., luring investors into paying excessive fees."*Id.* at \*8."Whether these alleged failures to disclose are couched in the terms of a fiduciary duty or claims of fraud, they are, in their simplest form, allegations that the Defendants 'omitted' important information from their disclosures to [investors] under the Agreement.... No matter how [the plaintiff] legally characterizes her claims, material misrepresentations and omissions serve as the factual predicate for [her] state law claims."*Id. See also Broadhead Ltd. P'ship v. Goldman, Sachs & Co.,* Civil Action No. 2:06CV009, 2007 WL 951623, at \* 1-5 (E.D.Tex. Mar. 26, 2007) (dismissing state-law claims for breach of fiduciary duty, breach of contract, and unjust enrichment based on a defendant's alleged failure to disclose all fees and expenses charged to investors because, disregarding the labels assigned to the causes of action, the gravamen of the complaint was omissions of material fact in the form of a failure to disclose fees associated with bond purchases).

The analysis applied in the foregoing authorities appears to apply with equal force in the case at bar. Although Kurz and Heinzl are at pains in their

complaint to avoid terms like fraud and misrepresentation, the basis for their state-law claims of breach of contract is undisclosed conflicts of interest and omissions of material fact by Fidelity and FMR. Thus, it appears that the claims in this case involve alleged misrepresentations or omissions of material fact within the meaning of SLUSA. Finally, given that the claims in this case involve alleged violations of the duty imposed on Fidelity and FMR to obtain best execution for customers in executing portfolio transactions, it appears that those claims are "in connection with" the purchase or sale of securities for SLUSA purposes. *See, e.g., Behlen v. Merrill Lynch,* 311 F.3d 1087, 1094 (11th Cir.2002) (holding that SLUSA's "in connection with" requirement was satisfied in a case alleging breach of contract, breach of fiduciary duty, misrepresentation, suppression, unjust enrichment, and negligence on the grounds that a brokerage firm and a mutual fund manager sold investors a certain class of fund shares in order to collect excess fees and commissions on the sales); *McCullagh v. Merrill Lynch & Co.,* No. 01 Civ. 7322(DAB), 2002 WL 362774, at \*4 (S.D.N.Y. Mar. 6, 2002) (holding that SLUSA's "in connection with" requirement was satisfied in an action seeking disgorgement of allegedly excessive commissions paid to an investment broker).

**\*9** "The jurisdiction of this court ... is contingent upon SLUSA's preemption of [the plaintiffs'] state law claims." *Rowinski v. Salomon Smith Barney, Inc.,* No. 3:02CV2014, 2003 WL 22740976, at \*2 (M.D.Pa. Nov. 20, 2003). If SLUSA precludes the claims in this case, then the Court has original jurisdiction to address this matter and must dismiss those claims; conversely, if SLUSA does not apply, then this case must be remanded to state court. *See id. See also Winne v. Equitable Life Assurance Soc'y of U.S .,* 315 F.Supp.2d 404, 409 (S.D.N.Y.2003) ("[I]f there *is* subject matter jurisdiction under SLUSA over a specific claim, then the Court *must* dismiss that claim.") (emphasis in original). Because the Court's subject matter jurisdiction in this instance rests upon SLUSA and because it appears from preliminary review of the issue of subject matter jurisdiction in this case that the claims of Kurz and Heinzl are indeed within the scope of SLUSA, the Court will order the plaintiffs to show cause why this case should not be dismissed pursuant to SLUSA.

**III. Conclusion**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 3231423 (S.D.Ill.)

The plaintiffs Kurz and Heinzl are hereby **ORDERED TO SHOW CAUSE** why this action should not be dismissed pursuant to SLUSA. The plaintiffs **SHALL** file a brief of not more than twenty-five (25) pages addressing the issue of SLUSA preclusion of the claims asserted in this case not later than thirty (30) days from the date of entry of this Order. If the defendants Fidelity and FMR wish to address the issue of SLUSA preclusion in this case, the defendants **SHALL** do so by a brief of not more than twenty-five (25) pages filed not later than thirty (30) days from the date of entry of this Order.

**IT IS SO ORDERED.**

S.D.Ill.,2007.
Kurz v. Fidelity Management & Research Co.
Slip Copy, 2007 WL 3231423 (S.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.